# 10-1241

_____

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

_____

**APRIL GALLOP, for herself and as Mother and Next Friend of
ELISHA GALLOP, a Minor**

*Plaintiffs-Appellants*

– vs. –

**DICK CHENEY, Vice President of the U.S.A.,
DONALD RUMSFELD, former U.S. Secretary of Defense,
General RICHARD MYERS, U.S.A.F. (Ret.), in their individual capacities**

*Defendants-Appellees*

– and –

**JOHN DOES Nos. 1-X, all in their individual capacities**

*Defendants*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

### BRIEF FOR PLAINTIFFS-APPELLANTS

_____

MUSTAPHA NDANUSA
26 COURT St., Suite603
Brooklyn, New York 11242
(718) 825-7719

DENNIS CUNNINGHAM
115-A Bartlett St.
San Francisco, CA 94110

WILLIAM W. VEALE
2033 North Main Street, # 1060
Walnut Creek, CA 94596

*Attorneys for Plaintiffs-Appellants*

TOMOKO ONOZAWA
Assistant United States Attorney
86 Chambers St, 3rd Floor
New York, New York 10007

*Attorney for Defendant-Appellees*

CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, counsel for the Plaintiffs, April Gallop and Elisha Gallop, by their attorneys, Mustapha Ndanusa Esq. and William Veale, Esq, certify that Plaintiffs are private persons. As such, they have no corporate parents, affiliates and/or publicly held companies that own 10% or more of their stock.

## Table of Contents

Page No.

STATEMENT OF JURISDICTION ... (1)

ISSUES PRESENTED FOR REVIEW ... (2)

STATEMENT OF THE CASE ... (3)

STATEMENT OF FACTS ... (8)

SUMMARY OF ARGUMENT ... (26)

STANDARD OF REVIEW ... (29)

ARGUMENT ... (30)

I.  The District Court had no fair basis on which to dismiss the Complaint. ... (30)

    A.  The Rule of the Supreme Court's Decision in *Ashcroft v Iqbal*. ... (30)

    B.  The District Court mis-applied the new rule set in the Iqbal decision. ... (33)

II.  The District Court's negative reaction to the very idea of the scandalous plot alleged by plaintiffs caused it to scorn well-pled, non-conclusory factual allegations which were more than adequate to support the charges against the defendants at the pleading stage. ... (39)

III.  The Court compounded its erroneous decision by dismissing the Complaint with prejudice, instead of giving plaintiffs Leave to Amend. ... (45)

CONCLUSION ... (47)

Certificates ... (51)

**Table of Citations**

*Ashcroft v Iqbal*, __U.S.__, 129 S.Ct 1937 (2009).                    (2, 5, 30, 31, 49)

*Bell Atlantic v Twombly*, 550 U.S. 544 (2007).                              (31)

*Chosun Intern., Inc. v. Chrisha Creations, Ltd.*, 413 F.3d 324 (2nd Cir. 2005).     (29)

*Conley v Gibson*, 355 U.S. 41, 46 (1957).                              (29, 30, 44)

*Day v Morgenthau*, 909 F.2d 75, 78 (2nd Cir. 1990).                          (45)

*D.C.D. Programs., Ltd. v. Leighton,* 833 F.2d 183, 186 (9th Cir. 1987).          (45)

*Denton v Hernandez*, 504 U.S. 25, 32-33 (1992).                              (34)

*Eastern States Retail Lumber Dealers Assn. v. United States,*                  (34, 36)
     234 U.S. 600, 612 (1913).

*Foman v Davis*, 371 U.S. 178, 182, 83 S.Ct 227 (1962).                        (45)

*Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir.2001).                          (29)

*Hampton v Hanrahan*, 600F.2d 600, 620-21 (7th Cir. 1979).                    (36)

*Neitzke v Williams,* 490 U.S. 319, 325,327, 328 (1989).                        (35)

*Pelman ex rel. Pelman v McDonald's Corp*, 396 F.3d 508, 511 (2nd Cir. 2005).    (30)

*Swierkiewicz v Sorema N.A.*, 534 U.S. 506, 514, 122 S.Ct 992, 999 (2002).        (31)

*United States v. City of New York*, 359 F.3d 83, 91 (2d Cir.2004)              (29)

**Rules**

Rule 8, F.R.Civ P.                              (5, 26, 30, 31, 34-36)

Rule 11, F.R.Civ P.                                          (4, 41)

Rule 12(b) F.R.Civ P.                                      (29, 46)

Rule 15(a) F.R.Civ.P.                                        (46)

## STATEMENT OF JURISDICTION

Plaintiff-Appellant APRIL GALLOP, for herself and her minor child, ELISHA GALLOP, filed a Complaint in the U.S. District Court for the Southern District of New York stating that jurisdiction is based under the First, Fourth, Fifth and Ninth Amendments to the U.S. Constitution, as applied to the federal officials under the rule of *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), 28 U.S.C. 1331, federal common law, and 18 U.S.C. 2333(a).  Complaint (Cpt) ¶8 **JA 13)**

By Memorandum Decision dated March 15, 2010, Judge Chin, insofar as relevant to this appeal, granted defendant DICK CHENEY's motion to dismiss for failure to state a claim upon which relief may be granted. Plaintiff GALLOP timely appealed from that decision on April 1, 2010 (**JA. 177**).

The U.S. Court of Appeals has jurisdiction to hear GALLOP's appeal based upon 28 U.S.C. 1291.

## ISSUES PRESENTED FOR REVIEW

1.   Whether the District Court erred and/or abused its discretion in dismissing plaintiffs' claims of complicity and conspiracy by high-level U.S. Government defendants in the terrorist "Attack on America" of September 11, 2001, as absolutely "implausible" under the Supreme Court's rule in *Ashcroft v. Iqbal*, 129 S.Ct 1937, 1951 (2009) and therefore frivolous, when in fact the claims were supported in the complaint by clearly sufficient, concrete, non-"conclusory" factual allegations, many of them undeniable?

2.   Whether the Court had legal authority to dismiss plaintiffs' claims as frivolous, without first "identifying the allegations in the complaint that are not entitled to the presumption of truth", per *Ashcroft v Iqbal*,; and while refusing to consider evidence submitted *dehors* the Complaint to show that its claims, while shocking, were not frivolous but well-founded, serious and substantial?

3.   Whether the Court erred further in dismissing the Complaint with prejudice, despite plaintiffs' submission of an extensive Appendix, containing additional factual material which further supported the plaintiffs' claims, which at the very least should have entitled plaintiffs to leave to amend to further bolster the claims in the Complaint?

## STATEMENT OF THE CASE

Ms. April Gallop, a member of the U.S. Army assigned to the Pentagon and there when it was attacked on September 11, 2001, brought suit in December, 2008, for injuries to herself and to her son, Elisha, a baby, who was with her in her office at the time and was also injured.  They alleged violation of her and her child's constitutional rights, by ways and means which truly shock the conscience, depriving them of Due Process under the Fifth Amendment by the rule of *Sacramento County v. Lewis*, 523 U.S. 833 (1998), along with injuries arising from acts of terrorism, under Title X, Sec.2337e, and common law conspiracy.  Named as defendants were then-Vice President of the U.S. Dick Cheney, then-Secretary of Defense Donald Rumsfeld, then-Acting Chairman of the Joint Chiefs of Staff Richard Myers, and an unknown number and assortment of other military and civilian officials named as John and Jane Does.

Plaintiffs charged that defendants knowingly, and with deliberate indifference to the vast potential for loss of life, injury, and deprivation of rights, acted, failed to act, and conspired, in a variety of ways, based on evident knowledge that a terrorist attack involving hijacked airliners was set to occur, which were designed and intended to, and did, facilitate, enable and aid and abet the attack.  Plaintiffs alleged that the reasons for such a ghastly betrayal of the Country by defendants were bound up in a will and desire they shared to bring

about a supremely fearsome terrorist catastrophe in the United States—"a new Pearl Harbor", in the words of defendants' own earlier published manifestoes — which would shock and frighten and anger the population so deeply that the Public, and the Congress, would accept and submit to extreme and extraordinary military, political and "security", measures, radically abandoning decades of past practice and principle, and flagrantly contravening the U.S. Constitution and U.S. and International Law in critical ways.

The complaint asserted that the object of the defendants' conspiracy was to bring into being, through shock and awe as it were, a public atmosphere in which they would have the color of authority, and impunity, to work these changes and initiate these new lunatic adventures and transgressions at home and abroad.

**       **       **       ****

The Court held a "motions conference" on April 8, 2009, after the three named defendants were served and the Government appeared on their behalf, and there in a brief, opaque exchange, asked counsel if we did truly stand behind the allegations in the complaint, explicitly within the strictures of Rule 11; and we assured him we did—and we affirm it to this Court also. **(JA. 36)** The Government said it would file a motion to dismiss, and plaintiffs agreed, bowing to the inevitable, to stay discovery until the motion was decided. But the Court

4

warned it was doubtful, consistent with his practice, that he would meet us again for any hearing.

The Government asserted in its Memorandum of Law a failure to state a constitutional claim, a statute of limitations claim as to Ms. Gallop, an estoppel claim, and even a qualified immunity claim; and summed up with a claim that plaintiffs' case was frivolous, and should be summarily dismissed.[1] (**JA. 39-40**) The filing came just before the Supreme Court's decision in *Ashcroft v Iqbal*, announcing a new rule of "plausibility" in judging the adequacy of a complaint under Rule 8. Plaintiffs began their Opposition Memo with a discussion of *Iqbal*, making clear the distinction, where they had submitted such a long complicated factual narrative in support of their grave accusations—which of course they knew would be more than odious to many people besides the defendants, possibly or even very likely including the Court.

The Government charged that plaintiffs' detailed narrative of the objective evidence, and exposure of multiple demonstrable contradictions in official reports and explanatory statements, in supporting their charges were "delusional... conspiracy theories", which should be dismissed by the Court out of hand. In

---

[1] Plaintiffs met these claims, as shown in their Memo and argued in particular that, even if Ms. Gallop's own claim were found to have been raised out of time—where she argued that its basis had been concealed, tolling the statute under familiar rules, and that this posed a question of fact which could not be resolved on this motion—her minor child's claim was preserved under the Virginia statute, and therefore the case would go ahead in any event; so the Court should refrain from deciding the Limitations claim until the evidence developed. Ibid.

response, we showed a broad base of factual information and support for various forms of "false flag" and "inside job" theories about 9-11, and an inventory of questions and contradictions arising from official responses to and explanations of what supposedly happened on September 11, contained in the Complaint.

In addition, the plaintiffs gave the Court a rich Appendix with their Memo, filled with strong analytical and expert materials further supporting their various contentions regarding official responses to and explanations of events of 9/11, which were and remain contradictory, impossible, false and fraudulent in explicit ways—reflected in the various materials they submitted —which supported the allegations in the Complaint, and proved its non-frivolous nature, all the more deeply. It contained testimonial evidence by fact witnesses (**JA. 158**), investigators, researchers, experts (**JA. 127, 144**) and others (**JA. 123**), supporting interpretations of evidence showing that a "false flag" conspiracy (or conspiracies) had in fact occurred. Plaintiffs argued this additional material—and these clearly unimpeachable testimonials— should be taken into account by the Court in considering whether the Complaint could reasonably be called frivolous, when it embodied so much broad-based public information and concern.[2] (**JA. 95-161**)

---

[2] *Time* Magazine reported on 9/6/06: "A Scripps-Howard poll of 1,010 adults last month found that 36% of Americans consider it "very likely" or "somewhat likely" that government officials either allowed the attacks to be carried out or carried out the attacks themselves. Thirty-six percent adds up to a lot of people. This is not a fringe phenomenon. It is a mainstream political

Defendants in their Reply brought new matter, asserting that Ms. Gallop was barred from suit by the doctrine of "intramilitary immunity", which prohibits a U.S. military service member from suing a superior officer, and restricts such claims to the military chain of command. The Court permitted plaintiffs to file a sur-reply to meet this new claim.

Without reaching other questions, by Memorandum Decision dated March 15, 2010 the U.S. District Court of the Southern District of New York (Chin, U.S.D.J.) granted Defendant-Appellees' motion on the basis of frivolousness of the complaint. **(JA. 162-176)**

This Appeal follows. **(JA. 177)**

---

reality. Although the 9/11 Truth Movement, as many conspiracy believers refer to their passion, has been largely ignored by the mainstream media, it is flourishing on the Internet."

## STATEMENT OF FACTS

On the morning of September 11, 2001, plaintiff April Gallop was an enlisted member of the U.S. Army, assigned to a post in the financial administration section of the Pentagon, which had offices on the ground floor, in the outer rings, on the side generally facing west. She had been on maternity leave for two months, since the birth of her son, Elisha; and on this day was coming in only to visit an off-site child care facility maintained by the Defense Department, where she planned to enroll her baby and have him cared for when she returned to full-time work, starting the next day. Instead, on telephoned instructions from her supervisor while she was en route, she reported to the supervisor's office, in the building. The supervisor told her there was an urgent matter she needed Ms. Gallop to take care of, first thing, and that she should come in and do that, and go see about the child care afterwards. (Cpt. ¶¶6, 34; **JA. 11, 22**)

On these instructions, Ms Gallop went to her office, put the baby down in his carry-chair, and turned on her computer. At that moment, an enormous explosion occurred, and the ceiling fell in on her and her child. Ms Gallop was hit in the head and lost consciousness, but recovered, grabbed the baby (then aged two months, and also hit in the head), and—seeing daylight where the front of the ground floor in her section of the building had been blown off—made her way through the rubble and out away from the building onto the lawn. There she

collapsed, and woke in the hospital some time later; and still later was visited there by DoD officials, who asked her what happened.  She told them a bomb had gone off in her section, but they said that was wrong; the building had been hit by an airplane, hijacked by terrorists. (Cpt. ¶¶33-35, **JA. 21-23**)

Plaintiff knew that no such enormous, meteoric, exploding missile had crashed and ripped into the building near her, and saw no sign of wreckage, and no burning jet fuel splashed around, when she made her way out after the blast; there was nothing but smoke, rubble, and dust, after a bomb.  Moreover, as a career soldier and a denizen of the Pentagon itself—where she had been working for a year on confidential fiscal and financial matters, after an involuntary transfer from her previous assignment in Germany—she was very aware that she was working in the most heavily, elaborately, expensively defended place on this earth.  This was something she had been indoctrinated about—the comprehensive radar, and the peerless fighter-interceptor squads on constant alert, hidden roof and ground emplacements, etc, when she came to work there; and there was no plausible explanation afterwards, from defendants or anyone, of how these defenses supposedly failed or could have failed.  (Cpt. ¶¶33-35, **JA. 21-23**)

More baffling still was how it could have happened that a rogue airliner had crossed hundreds of miles of U.S. airspace—for more than a half hour after the second of the two towers in New York had been hit by airliner living bombs,

9

leaving no doubt that the Country was under attack—but there had been no warning to her and the hundreds or thousands of other workers in the building, including the 125 who perished and those who were hurt. Repeated evacuation drills and instruction in safety procedures, ordained by Pentagon managers, had become irritatingly frequent in recent months; but there had been no alarm when it was needed, and no evacuation. (Cpt. ¶35, **JA. 22-23**)

The plaintiff pursued her legitimate concerns as best she could in the period after 9-11, joining a group of survivors seeking various benefits for victims of the attack, and she did get some help with treatment and assistance for her son as he continued to suffer long-term if not permanent effects from his apparent brain injury in the bombing; but at other points she has been rebuffed and ignored. (Cpt. ¶58, **JA. 32**) She and other victims attended a closed hearing of the 9/11 Commission where defendant Rumsfeld testified, and she was allowed to forward questions through Commissioner Jamie Gorelick. But her suggestions to the group that they had been ill-used, and that something was fishy, were met with fearful rejection, and ostracism; and Rumsfeld double-talked for much of the session and stonewalled her question about the failure of the air defenses. There were no satisfactory answers; only a growing sense that, along with the Public and the

entire world, she had been comprehensively lied to about what happened in the 9-11 attack.[3]  (Cpt. ¶¶44-46, **JA. 28-29**)

**       **       **       **

On the day of the attack, defendant Cheney was in effective command of the Government in Washington, the President being away on a photo-op in a second-grade classroom in Florida; Cheney had been specifically placed in charge of all U.S. counter-terrorism programs by the President in May, 2001.  Defendant Rumsfeld was in command of the Defense Department and its constituent services and agencies, including the Pentagon itself, and Defendant Myers was commander of the Air Force and acting Chairman of the Joint Chiefs of Staff, the highest-ranking U.S. military officer.  (Cpt. ¶11, **JA. 14**)

Although numerous high officials, including defendants and, famously, then-National Security Advisor, Condoleeza Rice, have insisted that no one in the government ever conceived of the possibility that airplanes would be hijacked and flown into buildings as living bombs, the record shows that the CIA, the NSA, the FAA and NORAD all had planned and trained for exactly such a possibility.  Such training occurred at the Pentagon in October, 2000, and May, 2001, and NORAD

---

[3]  Here and elsewhere we have interpolated various particulars not specifically included in the Complaint but which can now be seen to belong in the evolving narrative which supports the charges herein, and are included—with other smaller details—to round out the facts which can be shown to support the claims kicked to the curb by the District Court.  They likewise bolster plaintiffs' within claim that they were entitled to an opportunity to amend the Complaint, if nothing else, if its allegations were found to be insufficient.  See below, Pt III.

began planning in July, 2001, for a new training exercise, based on the premise that a hijacked plane had been flown into the World Trade Center.  (Cpt. ¶54, **JA. 31**)

The Air Force was alerted to the first of the wayward planes that morning by FAA flight controllers in Boston at or about 8:15, certainly by 8:20 a.m—when the first ominous voices and remarks were heard in the cockpit of Flight 11, which would hit the first World Trade Center tower at 8:46.  The first word from FAA about Flight 77, which supposedly hit the Pentagon at 9:38 a.m., was broadcast at about 8:55 a.m.  (Cpt.¶22, **JA. 18**)

The Air Force at that time had a complex of bases from which fighter-interceptors could be scrambled and flown to any spot in the Eastern U.S. in ten minutes or less.  These planes were normally in the air once or twice a week, sent by FAA to check on possible airline emergencies.  When a scramble order is given, pilots normally get from the ready room to 29,000 feet in three minutes or less, and the jets can reach speeds of 1600-1800 mph.  FAA Records show 67 trips aloft between September 1, 2000 and June 1, 2001.  (Cpt. ¶23, **JA. 18**)

On 9-11, the first word of a problem went out from the FAA around 8:14 am; a strange voice was heard in the cockpit of the first plane, and possible hijacking was first discussed among flight controllers, around 8:20 am; and the first airliner flew down the Hudson River approach at low altitude and crashed into the WTC North Tower at 8:46am; but the jets were nowhere near where they were

needed until almost 10:00 a.m.  No interceptor planes were mobilized and no other defense weapons or apparatus at the Pentagon were unlimbered to meet the third plane as it approached the Capital.  (Cpt.  ¶¶22-23, **JA. 18**)

Once it was known that Flight 77 (or some substitute) was out of contact and heading back towards Washington, the White House was evacuated; or at least several of its more important denizens were evacuated.  Defendant Cheney in particular, moved to an underground bunker known as the Presidential Emergency Operations Center (PEOC), where he was present at or about 9:20 a.m., at the latest, when then-Secretary of Transportation Norman Mineta arrived there and soon heard Cheney affirm "orders" given earlier, relating to the approaching plane. (Cpt. ¶¶26-32, **JA. 19 - 21**)

The 9-11 Commission Report states that Cheney did not reach the bunker until 9:58 a.m. that morning, but Cheney himself, in an on-air conversation with the late Tim Russert on September 18, 2001, recalled being in the bunker much earlier.  Secretary Mineta testified that, as he sat with the Vice President shortly after arriving, a young man came into the room several times to report that the approaching plane was "50 miles out"; "30 miles out"; "10 miles out".  At the 10-mile mark, the man asked Cheney, "Do the orders still stand?"  Mineta said Cheney "turned and whipped his neck around, and said, 'Of course the orders still stand.  Have you heard anything to the contrary?"  A short time later came the

word that the Pentagon had been hit. This testimony, although given under oath before the members of the 9/11 Commission, was not mentioned in its Report,[4] (Cpt. ¶29, **JA. 20**); and has apparently been removed from the Commission's video archive. Defendant Rumsfeld has given contradictory statements about his own whereabouts in the Pentagon that morning, in the last period before it was hit, and Gen. Myers testified he was in a meeting on Capitol Hill when he got word of the attack, and saw the smoke at the Pentagon out the window. Plaintiffs aver these are false cover stories, one way or another. Richard Clarke, the then-U.S. counter-terrorism coordinator, said in his book that both men were present in a communications room at the Pentagon when he convened a teleconference on the crisis from the White House, shortly after the second tower was hit in New York, a little after 9:00 am. (Cpt. ¶¶45-46, **JA. 28-29**) Needless to say, in keeping with the general official approach to the 'search for truth' about 9-11, the tape of this session has been withheld.

Rumsfeld is known to have discussed the prospect of a terrorist hijacking that very day, at a briefing early in the morning. Two days later he falsely reported on TV, on "Good Morning America", that the nose of the plane that supposedly hit the Pentagon was "still there, very close to an inner courtyard...," a patent

---

[4]  Added Fact: Mr. Mineta in May 2009, affirmed in person to plaintiff's counsel that he stood by his testimony before the 9-11 Commission about Cheney's exchange with the young man.

impossibility, nowhere otherwise recorded; and a few weeks later he spoke publicly of "the missile that hit the Pentagon".  (Cpt. ¶46, **JA. 28-29**)

**        **        **        **

Additionally, numerous particulars supported the plaintiffs' conclusion that, in fact, no hijacked airliner hit the Pentagon, and the death and damage there had other causes, including the following:

+ After the hit, roughly half an hour passed before the affected section of the building collapsed, from top to bottom, straight along one side of a structural section, layering the slanting, collapsed floors on top of each other, as shown in famous photographs.  Before that, while the structure was still in place, at least one photo was taken in which the face of the building shows clearly, despite some smoke in front of it, and there is no crashed airliner, no gaping hole in the facade, and no wreckage lying on the ground in front of it.  Instead, one can see that the outside wall has been blown off on the ground floor, only, and the vertical ends of intact interior walls perpendicular to it are plainly visible.  Another photo shows interior walls and ceilings blown down, structural members scorched black, and exposed pillars bent at the same curved angle, from blast pressure; but no sign of airplane wreckage. A third shows the round hole in the inner C-Ring wall—some 300 feet from the point of impact—where Rumsfeld said on TV the nose of the

plane had come to rest; but there is no picture of the nose in that spot.[5]  (Cpt. ¶40-a, **JA. 24**).  Photographs are at **JA. 150-151).**

+  Despite the accounted presence of literally dozens of regularly operating surveillance cameras trained on the building and/or the area around it, only two small, overlapping (same viewpoint) fragments have been released by the Pentagon.  Several witnesses have reported that FBI agents arrived the same morning and confiscated their tapes, and there is documentary evidence that the Government is withholding 85 tapes from such cameras, in an FOIA contest.[6] These together appear to show a long, thin, white or silver object, which enters the picture trailing white smoke and moving towards the building, followed by a big explosion; but it is far from clear that the object is a large airliner.  The other tapes are being suppressed by the U.S. Department of Justice—in furtherance of the cover-up, pursuant to the conspiracy.  (Cpt. ¶40-b, **JA. 24**)

+  The flight data recorder or "black box" supposedly recovered from the wreckage of American Airlines Flight 77 at the Pentagon, according to printout data released by the National Transportation Safety Board through an FOIA request, showed that the plane was 273 feet off the ground at a point some 400 yards short of the building—at which point the recorder inexplicably turned off.

---

[5]   It should be added that the nose section of such a plane contains its radar equipment, and is made of a light, porous, carbon-based material that allows the radar to function through it, which would have shattered on first contact with the outside wall.  (Cpt. ¶40-a, JA.24)
[6]   See: http://flight77.info/85tapes.gif;www.flight77.info/00new/n85reply.jpg

But the building is just over 70 feet high, and the plane supposedly flew horizontally into the side of it, at a left-hand angle, without first touching the ground.  In addition to other evidence, pilots and experts affirm that it would be impossible, as a matter of physics and aeronautics, to dive such a big plane 200 feet in that short space, and level off again at a height below 70 feet, so as to fly into the facade.  You couldn't pull out like that; instead, you would crash, short of the target.   (Cpt, §40-d, **JA. 25**; Affidavit of Rob Balsamo, in plaintiffs' Appendix, **JA. 145-146**).   Several additional contradictions also arise from the black box data.[7]  (Cpt. ¶¶39-40, **JA. 24**)

+  The man identified by the FBI as the hijacker pilot of Flight 77, Hani Hanjour, was known to be a totally incompetent pilot.  His earlier flying instructors even refused to fly with him in a small plane, and recommended that his license be revoked. (Cpt. ¶40-e, **JA. 26**)  The extraordinary maneuver said to have been carried out by the 757 just before its alleged impact—a stupendous and completely uncertain feat of flying for the most skillful and experienced of pilots; again, according to real pilots—was far beyond his abilities.   Nevertheless, his

---

[7]   All flights also carry second black box, a cockpit voice recorder (CVR), which, here, apparently was not recovered.  This is certainly a mystery in itself—particularly since it is also asserted officially that the remains of the individual passengers were identified through DNA recovered from body parts in the wreckage—but only one of several described in the Complaint, notably including a direct contradiction between the Commission and the National Transportation Safety Board concerning the plane's flight path, as support for plaintiffs' allegation that no plane in fact hit the Pentagon (See ¶40, JA.24ff).  A plane came and went, but something else blew up the building.

identification by the FBI—whose unverified word as to all the names, identities, backgrounds, groupings, associations and roles of the nineteen men supposedly involved in the taking of the various planes: fifteen Saudi Arabians, two from the Emirates, one Moroccan, one Lebanese (and no one from Iraq, Afghanistan, Pakistan, Iran, Hezbollah, Hamas, Venezuela...etc)—was taken at face value by the 9/11 Commission, and the entire U.S. Establishment and mainstream press (despite the Bureau's long history of lying with impunity and other perfidies, including those in this case, which are also part of the greater facts of this case.)[8]  It is all we have on the subject.

+ Finally, we learned that at the time of the plane's approach another plane, readily identified as a US Air Force E4-B—the so-called flying Pentagon, or "Doomsday Plane", said to contain the complete equipage for highest level electronic and other command and control operations in combat, and otherwise— was circling over the nation's capital; and it was shown on a CNN broadcast, visible on YouTube, above the White House around the time of the explosion at the Pentagon.  Some witnesses also said they saw a helicopter, which could have fired a well-timed missile, fly over and disappear behind the building just before the explosion.

---

[8]   Indeed one of the great abiding 9-11 mysteries is how these 19 men, some of them marked terrorist and even Al Qaeda suspects—and all of them evidently known to authorities, who managed to circulate their mug shots around the world within a day or two of the event—were able to board the four planes that morning, in groups, with weapons, on reservations booked in their own names, without let or hindrance…

+ Somewhat collaterally, Defendant Rumsfeld held a press conference on September 10, 2001, still visible in several versions on YouTube, at http://www.youtube.com/results?search_query=Rumsfeld%2B2.3+trillion&aq=f , in which he announced that officials had discovered a shortfall of $2.3 trillion dollars in Department of Defense accounts. This issue, and this money, per Nexus search, have received no serious mention in the press at any time from that day to this, despite the correlative fact that, to plaintiff's knowledge, the first floor section of the building, which received the direct hit and was greatly destroyed, contained financial offices and records (and perhaps personnel?) obviously implicated in the missing money issue. (Cpt. ¶42, **JA. 27)** Plaintiffs see this as a possible secondary motive to attack the building, and perhaps the basis for planning where and how to attack it, in a carefully targeted, limited way which would also allow a guilty Rumsfeld (and others) to remain inside while the attack came, as part of the cover story.[9]

---

[9]   It will be noted that facts relating to the destruction of the World Trade Center towers were left out of the Complaint, despite their prominent place in conspiracy theories about 9-11, including plaintiffs'. They can, would, and should be included, since they also implicate the failure of air defenses, but more so because the destruction of the three (3) buildings was so clearly an Inside Job of some kind, involving pre-setting of explosive and nanothermite charges, evidently as part of the attack facilitated by defendants' conspiracy.

   Briefly, anyone can see from the photographs and videotapes that the towers, first one and then the other a half-hour later, blew up, in enormous explosions or groups of explosions, which sent them crumbling straight down to the ground at free fall speed, and blew out huge, choking plumes of pulverized plaster, insulation, concrete and other materials which settled inches thick on the ground, and everything else all over lower Manhattan, and blew a noxious cloud of dust all the way to the middle of Brooklyn. Bombs did that, and nanothermite dismantled the steel.

\*\*      \*\*      \*\*      \*\*

On a deeper level, strong evidence of the broader motive ascribed to the

defendants and their co-conspirators in the Complaint is found in the years-long

---

One look at the amount and size of the steel in the superstructure, shown in photos taken during construction, should suffice to allay any doubts on this subject

As recently reported in a peer-reviewed article in "The Open Journal of Chemical Physics", a scientific publication, in April, 2009, several samples of the dust and debris have been proven to contain residues from nanothermite, a highly advanced super-combustible substance which burns at 4500-5000 degrees, and can instantly cut through the thickest steel, accounting for the collapse of the towers' superstructures into manageable pieces, which were hauled away from the crime scene almost immediately, without inspection or testing, and shipped to Bangladesh as scrap.

In addition, some 118 surviving firefighters and EMTs testified afterwards that they heard and/or felt explosions inside both buildings around the times they collapsed. Their statements were obtained from the City of New York by the New York Times in 2005. The Times put the testimony on a website, but never reported on it.

The idea—a linchpin of the cover-up—that collapses of the two towers were caused by their hundreds of huge steel structural members suddenly melting in the fires resulting from the plane crashes, causing the upper sections to drive and crumble the long, intact lower sections straight down into dust by force of gravity, is, not to put too fine a point on it, preposterous. An organization of more than 1200 architects and engineers, among others, has denounced the official explanation, giving a concise list of reasons and calling for a new, impartial investigation. See: AE911truth.org.

Most strikingly, as this group and others point out, Building 7 at the Trade Center also collapsed—also straight down in free fall, quite clearly and visibly brought down by patterned explosives, as captured on film, just as in regular high-rise demolitions—seven hours after the other two buildings went down, without being hit by a plane, or suffering more than minor fires. Several people, including Mayor Giuliani, hours earlier, were heard to say beforehand that this would happen.

But the 9-11 Commission did not mention Building 7 in its report, at all; and no official explanation was established for this collapse for eight years, until the National Institute of Standards and Technology, an arm of the U.S. Department of Commerce which had been directed to make official reports on the collapse of the WTC buildings, issued its Final Report on WTC 7 in November, 2009. This document was laced with false statements, faked findings, and rigged computer models—and has spawned some of the finest private, independent scholarship in opposition to an official government pronouncement that any democracy could hope for—essentially merely repeating the canard about vast amounts of structural steel melting, all at once, in a total, nearly instantaneous collapse. No steel frame building in the history of construction ever collapsed because of fire before that day.

And so forth; of course there is much more, and it goes deeper, leaving many mysteries. In truth, the signs of an Inside Job are even more flagrant as to the towers—all three of them—than those which concern the Pentagon.

participation of defendants Rumsfeld and Cheney in the "Project for a New American Century", and their subscription to its manifestoes and public policy statements.  The 'PNAC', a collection of "neo-conservative" politicians, academics, publicists and others, with rich funders, banded together during the 1990s to advocate and seek support for their militant view that the United States was grievously losing its power and pre-eminence in the world, particularly because it did not physically and militarily control the supplies and sources of petroleum in the Persian Gulf and Central Asia on which its continued dominance was seen to critically depend, and that bold military action was urgently needed to remedy this.

The group saw indifference and pervasive doubt about the need to project U.S. military power into these areas, in the minds of the American Public, as the principal barrier to the needed action.  In 1998, in its publication, "Rebuilding America's Defenses", the group observed that some cataclysmic, consciousness-changing event, "a new Pearl Harbor"—which would galvanize public opinion, and emotion, in support of the military and political interventions the group thought necessary, in Iraq in particular—would be required to change this state of affairs.  (Cpt. ¶¶2-3, 16-20, **JA. 10, 15-17**)

The attack of 9-11 was a comprehensive, made-to-order solution, and the record shows the defendants and their cohorts in the Bush Administration wasted

no time in taking full advantage of the "opportunity" that arose from it, as defendant Rumsfeld characterized it immediately afterwards.

Moreover, it has been shown that the Bush Administration with defendants Cheney and Rumsfeld at its head earlier severely cut back the counter-terrorism program and practice which had developed in response to Al Qaeda attacks during the Clinton years, starting when they came into office in January 2001. Clinton's counter-terrorism coordinator, the afore-mentioned Richard Clarke, was retained in the post, but dis-empowered, and frozen out of the President's inner council, the so-called "Principals Group", which defendants were at the center of. Clarke's concerns about live threats from Al Qaeda were shined on by defendants and their colleagues, where not brushed aside altogether, throughout the first eight months of 2001. He recounted it all in his book, and his account as such has not been challenged by any of the "principals". (Cpt. ¶¶16-21, **JA. 15-17**)

More specifically, Clarke's book conveys evidence showing that numerous warnings were received, in growing volume and particularity—as many as 40 separate messages in all, from intelligence sources in ten or eleven different countries—which culminated in the infamous Briefing to the President of August 6, 2001, entitled, "Bin Laden Determined to Strike in U.S." The receipt of these warnings was also catalogued in the 9/11 Commission Report—and juxtaposed there, without comment, with the co-chairmen's account of their off-the-record, no-

notes-permitted interview with the President and Vice President together, in which they report Mr. Bush assured them there had been no warnings at all.[10] (Cpt, ¶¶16-21, 53-55, **JA. 15-17, 31**)

**       **       **       ****

The last pillar of hard evidence supporting the conspiracy claim is the Commission Report itself, "The Final Report of the National Commission on Terrorist Attacks upon the United States", which presents the official, cover-up version of the event. Two most prominent features—along with the failure to point out the President's lie about warnings—are omissions. There is no mention at all of Secretary Mineta's testimony about Cheney's apparent stand-down order, or about

---

[10]     This striking contradiction was exposed, dissected and condemned in a prominent screed by a venerable and most respectably credentialed commentator, the late Benjamin DeMott, writing in Harper's Magazine just weeks after the Report was published, in an issue depicting on its cover a large, messy bucket of whitewash (See "Whitewash As A Public Service: How the '9/11 Commission Report' Defrauds the Nation", Harpers Magazine, October, 2004). Like the many other shocking anomalies which have come to light since the event, and publication of the Report, the screed and the lie behind it were studiously ignored by the political Establishment and the Mainstream Press.

An even more telling comment came from an even more highly qualified observer, Thomas Powers, who reviewed the copious information the Government had received from various sources, warning of an impending attack, which the CIA—despite being blamed for a supposed failure of intelligence which permitted the attack to succeed—had in fact passed on to the President and his close advisers (including defendants). Noting that essentially no action had been taken in response to these warnings, Powers observed,

> There are lots of things to do when you don't know exactly what to do (to
> protect against attack). But the president did nothing. It would be hard to find
> words adequate to describe the full range and amplitude of the nothing that he
> did. My own preliminary, working explanation is that for reasons of his own
> the President *decided* to do nothing. Why? Historians will be occupied for
> many years before they come to agreement on the answer to that question.

See, Powers, "Secret Intelligence & The 'War On Terror'", The New York Review of Books, December 16, 2004, p.51. (Emphasis the author's) Again, plaintiffs assert these interpretations by respected commentators are entitled to real weight, in showing that their claims are not frivolous.

the wholly inexplicable, obviously rigged collapse of WTC Building 7—which was not hit by a plane and suffered only minor fires—at 5:20 p.m. on September 11. (Cpt. ¶¶28-32, 53-55; **JA. 20-21, 31**)  As noted, Commissioners were spoon-fed information by the FBI, and made do with, and parroted, CIA summaries of supposed information supposedly gotten from captured supposed "key" al Qaeda cadres—who later turned out to have been hideously and lawlessly tortured, including one, the notorious "KSM", who was "waterboarded" (i.e, drowned and then brought back to life) more than 180 times.

In his book, "The 9/11 Commission Report: Omissions and Distortions" (Olive Branch Press, Northampton, Mass, 2005), a relentless examination of false steps and false statements by the Commission, Professor Griffin has identified 115 separate and distinct "lies of omission or commission" contained in the Report. (Griffin Affidavit, Par.III, **JA. 110-111**).  Another book, "The Commission, an Uncensored History", published more than a year later by then-*New York Times* reporter Philip Shenon, documents some of the compromising influences exerted on the Commission by the Bush Administration, but fails to mention Griffin's exhaustive study, or any of his 115 reported falsehoods, and makes no attempt to refute any of his criticism—confirming that the method of choice for the their defenders as well as defendants themselves, is to ignore criticism completely.

A still more recent work, "The Ground Truth", by John Farmer, who served as Chief Counsel for the Commission, established the damning fact, hardly surprising at this point, that the Commission's Report was in fact prepared in outline form by its executive director, Bush Administration operative Philip Zelikow, before the Commission's "investigation" was even begun; and that the staff was organized and directed by him to produce separate bodies of evidence for particularized conclusions already determined beforehand.[11]

---

[11]   So much controversy arose around the Report that the Commission's co-chairmen, former New Jersey Governor Thomas Kean and former Indiana Congressman Lee Hamilton were moved to publish a book of their own, "Without Precedent: The Inside Story of the 9/11 Commission", to explain away what they dismissed as… conspiracy theories.  But, while confirming the large amount of inter-meddling and political pressure which came from the White House while the Commission was trying to do its work, they raised more questions than they answered about the report itself.  Professor Griffin undressed this propaganda exercise and others in "Debunking 9/11 Debunking" (Olive Branch Press, 2007), the fifth of nine books (so far), in which, with consummate scholarship, he has literally demolished the official 9-11 story, totally.

## SUMMARY OF ARGUMENT

The District Court erred, and abused any discretion it may be thought to have had under *Ashcroft v Iqbal*, by making a blanket determination, not based on the factual allegations it was faced with but on the Court's subjective, personal reaction to the horror of the very thought of the wrongdoing alleged, that the plaintiffs' claims were absolutely implausible—as a matter of law, as it were, emanating from the depth of the Court's gut—and therefore frivolous, and to be quashed without recourse. In essence, the Court first denies that the facts are factual, and dismisses just about all of plaintiffs' very concrete narrative as "speculation and conjecture". Then he says it doesn't matter in any case, because the claim of defendants' complicity in the 9-11 attack is too far-fetched and outrageous to be taken seriously, regardless of the facts. Querulously, he holds the Complaint is frivolous, even if all plaintiffs' allegations are taken as true.

The Court thus misappropriates the authority of *Iqbal*, and violates the Rule 8 principle the Supreme Court sought to establish there, to suppress claims which a fair reading will readily show to be supported by myriad factual assertions in the Complaint, in abundant detail, forming a web of allegations that are not "conclusory" at all, but perfectly well-grounded and concrete. The Court failed to carry out the mandate of the *Iqbal* decision, which required it to identify the allegations in the complaint which were "disentitled to the presumption of truth",

because they were "conclusory", eliminate these, and then determine whether the remaining allegations would support "plausible" claims of wrongdoing. This was an error of law in applying the rule of the *Iqbal* decision (and/or an abuse of discretion, if that were any part of the standard), because the *Iqbal* test was not fairly applied.

In addition, the allegations in the Complaint were multiplied and fortified in an Appendix to plaintiffs' Memo opposing the motion to dismiss, which contained many additional concrete facts, legitimately adduced with other extrinsic materials showing broad support for plaintiffs' conspiracy theories, specifically to meet defendants' claim that the case was frivolous.

Plaintiffs believe the facts clearly alleged in the Complaint are more than sufficient to properly support their charges against the defendants at the pleading stage, however horrifying the charges are. Further, the assertion that the Complaint is frivolous effectively takes consideration of the Motion to Dismiss beyond the 'four corners' of the Complaint—if there is any doubt of its narrative substance—obliging the Court to consider extrinsic evidence submitted to show it is not frivolous, but substantial. Bringing that expanded circle of facts into the discussion is fair and appropriate, indeed essential, because the conception behind a fair judicial determination and legal judgment of frivolousness must reasonably comport with some measure of general public understanding , and attitude—to say

nothing of an elemental knowledge of human history—rather than deriving from the narrowly personal aversion that was applied here by the District Judge.

That is, there must be some articulable objective basis on which the Court determines the supposedly "delusional, far-fetched, etc" averments by plaintiffs are, legally, "implausible" under the *Iqbal* rule—as opposed to outrageous and unthinkable in the Court's own mind— to a degree entitling defendants to dismissal of the case as frivolous. Moreover, the Appended materials showed concretely that a large number of additional facts—where more information and understanding is accumulating all the time, as we will see—could be adduced in support of the plaintiffs' allegations in an amended complaint, making dismissal with prejudice doubly inappropriate.

In fairness, plaintiffs are entitled to serious consideration of the specifics in their evidence—and to bring additional evidence, if necessary—to show that their case is not frivolous, however horrifying or outrageous its chief allegations may seem, but substantial, and serious, and, with or without emendation, fully deserving of plenary consideration, with attendant discovery rights, in the Courts of the United States.

## STANDARD OF REVIEW

"We review *de novo* a district court's dismissal for failure to state a claim, accepting the plaintiff's factual allegations as true and drawing all reasonable inferences in the plaintiff's favor. See, e.g., *United States v. City of New York*, 359 F.3d 83, 91 (2d Cir.2004). A complaint should only be dismissed where it appears beyond doubt that the plaintiff can present no set of facts entitling him to relief. See *Conley v. Gibson*, 355 U.S. 41, 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)." *Chosun Intern., Inc. v. Chrisha Creations, Ltd.*, 413 F.3d 324 (2nd Cir. 2005).

"We review a Rule 12(b)(6) dismissal de novo, accepting all of the plaintiff's allegations as true and drawing all inferences in a manner favorable to the plaintiff. *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir.2001). Complaints alleging civil rights violations must be construed especially liberally. Id." *U.S. v. City of New York*, 359 F.3d 83 (2nd Cir. 2004).

## ARGUMENT

## I. The District Court had no fair basis on which to dismiss the Complaint.

### A. The Rule of the Supreme Court's Decision in Ashcroft v Iqbal.

The Supreme Court's decision in *Ashcroft v Iqbal*, __U.S.__, 129 S.Ct 1937 (2009)—in keeping with the generally roughshod-riding approach its new majority has taken to precedents it finds inimical to its view of 'the way things're s'posed to be'—hacks away the non-judgmental underpinning of Rule 8, *Fed.R.Civ P.,* which formerly gave a plaintiff the benefit of the doubt with respect to his or her "short, plain statement of the claim showing that the pleader is entitled to relief" under the rule, by providing that only the "bare bones" of the claim need be stated, just sufficient to allow the defendant to formulate a response. See, e.g, *Pelman ex rel. Pelman .v McDonald's Corp*, 396 F.3d 508, 511 (2nd Cir. 2005). This venerable rule, made plain long ago in the Court's decision in *Conley v. Gibson*, 355 U.S. 41, 46 (1957), held that a complaint should not be dismissed unless "it appears beyond doubt that the plaintiff could prove no set of facts which would entitle him (sic) to relief". It was routinely relied on by this Court in its own decision sustaining the charges in the *Iqbal* case. It provided that, for purposes of moving the matter forward, the facts alleged in a complaint should be taken as true.

In *Iqbal*, this "notice pleading" rule, "the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim,"[12] was set aside by the Supreme Court on certiorari, in favor of a much more exacting standard, which appears to arm district courts with broad, new powers to screen cases for "plausibility". Drawing on its recent decision in an anti-trust case, *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), the Court broadened its rule to apply to all cases. It said first, "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"; and that Rule 8 (to get to the heart of the matter) "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions". Second, it said, "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 129 S.Ct at 1950 (internal cites and quotes omitted).

Although the Court did not say just how these two principles are to be applied together, in a situation where a plaintiff is armed with <u>something</u> more than conclusions, it did emphasize, in discussing the complaint, that "legal conclusions"—or what it further brands as "conclusory" allegations—are the target its ruling is aimed at:

---

[12] See *Swierkiewicz v Sorema N.A.*, 534 U.S. 506, 514, 122 S.Ct 992, 999 (2002).

> To be clear, we do not reject these bald allegations on the ground that they are unrealistic or nonsensical... (or) too chimerical to be maintained. It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.

129 S.Ct at 1951 (Emphasis added; internal cites omitted).

However, the Opinion in *Iqbal* is ambiguous, with respect to what does or does not constitute a "conclusory" averment of fact. The Court says, "We begin our analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth", and then—within the stricture, quoted above—we proceed to "consider the factual allegations... to determine if they plausibly suggest an entitlement to relief." Id. 129 S.Ct at 1951.

One takes it the Court means the facts remaining after "conclusory" allegations are eliminated. But we say this means, or at least fairly requires, that the supposedly conclusory matters must be identified as such, and the reasons given, each by each, why they are "disentitled" to the normal presumption of truth. "Conclusory" is a rubbery term, not found in dictionaries and producing a red, no-go underline when inscribed in Word or Word Perfect on the computer. Rather, it is a judicial coinage, normally used to relegate assertions which lack foundation, but also, sometimes, opportunistically, to smother claims a Court finds "fanciful", or perhaps overly contentious, or otherwise impalatable. Oftentimes, one person's conclusory allegation is another's reasonable inference…

To be fair, and avoid abuse, there must be some objective standard by which a court's determination of 'conclusory-ness' can be measured. The impatient, ambivalent and ultimately quite contradictory outlook reflected in the District Court's blanket treatment of the factual averments here shows why.

**B. The District Court mis-applied the new rule set in the Iqbal decision.**

The District Court makes short work of the plaintiffs' long presentation of facts showing what happened to cause violation of her rights and injury to her and her child, by defendants, essentially denying that the facts on which their circumstantial case is based are factual, relying on (or hiding behind) *Iqbal*. Describing the case, he first quotes at length from the conspiracy theory part—but without reference to the "new Pearl Harbor" the defendants and their cohorts longed for, which gives the conspiracy its meaning—and adds a fragmented list of pithy short extracts, seemingly meant to reflect what he sees as the far-out nature of the narrative offered to prove it. Then he says, "The Complaint pleads little in terms of factual content beyond what Gallup saw and experienced herself at the Pentagon on September 11th (Decision, p.10, **JA**. **171**); and rejects her eye-witness assertion that there was no plane crash, as unreliable—given the conditions, and her collapse after getting out, etc—a fact-finding judgment he obviously has no business making at this stage—unless *Iqbal* is even more radical than it seems...

The Court goes on to relegate the balance, some 20 closely-written pages of intensely factual narrative, without analysis; simply setting up the whole story for a knockout by his imminent finding that it's all implausible, period. Of dozens of specific, concrete allegations he sees just two as even "arguably factual": that warnings about an Al Qaeda attack were "missed" (where in fact they weren't missed at all, but, indisputably, received and ignored, as plaintiffs relate (Cpt. ¶¶17-20, **JA. 16-17**); and that fighter jets had time to intercept the hijacked planes but failed to do so; which is certainly true. The vast, critical remainder of plaintiffs' allegations he simply dismisses, as "speculation and conjecture, ...mere conclusions," which he says he may refuse to take as true, under the new rule of pleading announced in *Iqbal,* despite the normal application of Rule 8. And he does so refuse (and the two "arguable" facts get lost in the shuffle...).

But the Court then changes tack, leaving no doubt of his basic assessment of the case, saying flatly in his Point 2 that plaintiffs' core allegations, charging a great, historic betrayal of the country by three or more its highest officials, are absolutely not plausible in any case, "even assuming the factual allegations of the complaint are true"(!). The Court borrows several pejorative terms: "factually frivolous", "clearly baseless", "fanciful", "fantastic", "delusional," etc, from the Supreme Court's decision in *Denton v. Hernandez* to fortify its castigation, but never applies them to any specifics; and it is clearly the horror of the very idea of

what plaintiffs allege—or maybe more accurately the outrage it causes—which sweeps all before it in this decision.[13]  The Court says, in effect: 'These defendant officials never would do the things you suggest, period; regardless of what you say happened':  "It is simply not plausible..."  (Decision, p.11, **JA. 172**).

This was a completely inadequate judgment, and, in light of the concession, a contradictory one, to say the least, and plaintiffs complain to this Court that the new-look, *Iqbal*-harnessed Rule 8, conditioning the dismissal of frivolous claims, was applied arbitrarily and erroneously by the court below.  The allegations of wrongdoing arise from a factual narrative which, horrors aside—and dismissive, knee-jerk cliche "conspiracy theory" opprobrium also aside—fairly and logically (appropriately, circumstantially, admissibly) supports those charges.  The District Court's application of *Iqbal* in such a faulty way, with no accounting for which particulars he finds 'disentitled' to be taken as true, let alone why—reflects the mischief in an un-formed, untethered concept of conclusoriness.

Of course the key allegations of wrongdoing are couched, necessarily, as inference—where circumstances clearly preclude the existence of direct evidence

---

[13]  See, *Denton v Hernandez*, 504 U.S. 25, 32-33 (1992) (quoting *Neitzke v Williams,* 490 U.S. 319, 325,327, 328 (1989) (Mem Decis p.11-12, JA.___).   The Court also appears to have seized, *sub silentio*, the discretion affirmed in *Denton*, under 28 U.S.C 1915(d), to dismiss claims by indigent prisoners, appearing pro se without payment of filing fees, which a Court finds frivolous.  Suffice to say, this is not an indigent pro se prisoner case, and the discretion provided in the statute does not apply.

of the plotting in plaintiffs' hands[14]—and of course such inferences are super-contentious here, since they allege truly appalling wrongdoing by the defendants. But the repellent, even outrageous nature of the claims of wrongdoing, as the Supreme Court said plainly in *Iqbal*, is not the issue; the issue is fair assessment of the supporting facts the plaintiff alleges. The Court, again, said it did not "reject these bald allegations on the ground that they are unrealistic or nonsensical... It is the(ir) conclusory nature... rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth." 129 S.Ct at1951.

That is, the issue is not whether the charges of wrongdoing are "unrealistic or nonsensical", or too horrifying—although they are undoubtedly so horrifying as to seem, without examination, necessarily delusional to many people—but, rather, whether the facts presented in support of the charges must be taken as true, under Rule 8, or whether they are "disentitled", in the Court's term, because they are of a "conclusory" nature (to use its other term). This seems clearly the nub of the Supreme Court's decision to form and announce its new rule.

The District Court, however—despite being instructed by *Iqbal,* to "begin (its) analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth";129 S.Ct at 1951—abandons that project almost as soon

---

[14]    "It is elementary...that conspiracies are seldom capable of proof by direct testimony and may be inferred from the things actually done." *Eastern States Retail Lumber Dealers Assn. v. United States,* 234 U.S. 600, 612 (1913). See also, *Hampton v Hanrahan*, 600F.2d 600, 620-21 (7th Cir. 1979).

as it starts; it makes a different judgment instead, finding that even if the supporting allegations are taken as true, the charges reflect "cynical delusion and fantasy", and are frivolous, and will be squashed by the Court without day. He rules, clearly based on his own absolute rejection of the charge of treasonous plotting, and regardless of any facts, that the case is "implausible", and therefore legally frivolous. "They would never do that", is the sum and substance of his Decision. Instead of facing the question, the Court below gives in to the horror, and (mis-)applies the *Iqbal* kibosh, out of hand.

But this was a determination of law as to the adequacy of plaintiffs' complaint, and so it requires an orderly legal foundation. The two issues in the *Iqbal* test, seen in the two-part failure of the District Court to comply with it, require, first, that it identify allegations in the complaint that are disentitled to the presumption of truth; then, discounting such conclusory items, it must determine whether the claims of wrongdoing and injury are reasonably supported by the remaining facts alleged. Here, the Court erred in its application of *Iqbal*—first by simply sweeping aside the near-entirety of factual allegations, rather than evaluating them for conclusoriness; then by reversing his field and embracing them all, and coming to the same result.[15]

---

[15]    To be sure, there is no doubt the District Court has authority to throw a frivolous case out of court, particularly a conspiracy case, when it is plainly insubstantial or wacky, consisting of wild or unprovable allegations; and here the District Court cited a passel of such cases, generally filed

The truth is this case was determined on horror—and revulsion, and anger—at the mere idea of the great plot alleged by plaintiffs. This caused the court below to simply dispense with the consideration of facts alleged mandated by *Iqbal*, while using the decision as authority to enforce his gut feeling—along with the unspoken corollary here: that such a claim cannot be heard on its merits, nor yet even litigated, for political reasons, and so it must not be countenanced in the first instance. Evidently, or so far, the particulars mostly can't even be discussed.

Thus the enactment in Point 2, after the discussion of facts in Point 1 was aborted: it couldn't happen, it's a cynical delusion, *ergo* it's a frivolous claim and will be dismissed, period. The idea of a possible bolstering amendment never entered in; the idea that there could be a showing of non-frivolousness never entered in. Such a decision, lacking a reasonable, *Iqbal*-compliant analysis, and thus any fair basis for understanding, let alone reviewing, a determination that the claims are frivolous, must be set aside.

---

by nutballs, from the capsules in his footnotes, with nutball claims (fn3, p.12, **JA.173**). He includes three arising from 9-11, (Id. Fn 4), all saying something of some of the same things plaintiffs are saying, but all sounding cuckoo also, nevertheless.

     Those cases, all decided before *Ashcroft v Iqbal*, are not this case. Although the District Court lumps them with this case, in fact they provide a fitting contrast to it, and must be distinguished, precisely along the lines indicated by *Iqbal*, relating to the absence of 'hard, inference-producing facts', susceptible of ascertainment and proof, and those plaintiffs' reliance on unfounded or un-provable, conclusory allegations in their place. Particularly in making the specific judgments at issue here regarding conclusoriness (especially since they weren't made), each case obviously must be determined on its own particulars.

In truth, there is no legal question here, but rather a moral or existential or perhaps a political one; the legal question is open and shut. It remains to be seen whether the real, undeniable, well-pled and fully adequate (and expandable) factual basis for the accusations in the Complaint will be acknowledged, in spite of the range of horrifying implications, or the if the horrified pre-judgment will be allowed to stand..

## II. The District Court's negative reaction to the very idea of the scandalous plot alleged by plaintiffs caused it to scorn well-pled, non-conclusory factual allegations which were more than adequate to support the charges against the defendants at the pleading stage.

To be as blunt as the district judge was, it is simply dishonest, intellectually and otherwise, to assert that the averments in this Complaint are not "factual", but rather "conclusory" (although he does not use that magic word), and thus subject to judicial disregard under the *Iqbal* case; and this obviously affected the Court in giving up on the *Iqbal* analysis, and cutting to the chase: it doesn't matter what you say happened, you lawyers.

And of course it is true that the specific accusations of betrayal: complicity, evil motive, moral abandon, etc, reflect an interpretation of the circumstantial facts and evidence which is shocking indeed, and certainly the thought of such a thing will be scandalous and unacceptable to many Americans, perhaps most. That does not change the factual or "arguably factual", non-conclusory character of the representations the accusations are based on, carefully spelled out as they are

(especially in the expanded version here), or their proper entitlement to the presumption of truth at the pleading stage. That's what the Supreme Court said, precisely, as quoted above.

Only consider the narrative we have struggled to establish—that the Court below ultimately seemed to agree to take as true—which this Court must now deal with *de novo*. The allegations included things generally known and indisputable, such as the two the Court acknowledged: that the warnings about an impending Al Qaeda attack were ignored (not "missed"), and that the interceptor jets never appeared; and there are things shown in ways we claim we can prove, such as what time(s) the FAA sent word to the Air Force that planes were needed, and how available they were, or should have been, etc. Similarly, there is not just arguable but solid, unmistakable evidence—CNN broadcast tape—that the Air Force "Doomsday Plane" was circling over Washington, for example; and that defendant Cheney made sure the "orders" about the incoming plane were not changed at the last minute—"ten miles out"—as Secretary Mineta testified.

These are facts, plain and simple, which no judicial repugnance can wish away—or rob of their inherent evidentiary power. Similarly, it is undisputed that the rogue plane—apparently at just about that moment—went on an astonishing, near-impossible, spiraling, 8000-foot, 330-degree, diving path, to supposedly hit (or in fact fly over) that exact, otherwise wholly unlikely certain part of the

building, where the financial records were—leaving defendants & Co. safe in their far-away offices on the other side—and that the man officially said in the cover-up report to have flown the plane had recently been washed out by flight instructors, who said he could not even safely fly a Piper Cub let alone an airliner, and that his pilot's license should be revoked.[16]

And the eyes have it here also, since there is no picture showing a crashed plane at the Pentagon; and the pictures we have show the absence of any plane. Indeed, the absence of photographic and videographic evidence which could confirm or refute plaintiffs' claims about how the building was hit is striking; and the totality of facts alleged, taken with this lacuna—where the evidence in question is baldly withheld by the Government at this moment; and (like the truth shown in the tape of Richard Clarke's 9:10a.m. or thereabouts White House teleconference) within their knowledge while they plead this case; speaking of Rule 11—shows clearly that the hijackers were indeed hugely enabled in the horrific attack, in numerous ways.

Indeed the Government posits a wholly *implausible* skein of simultaneous and sequential sudden failures, within a long-established, well-practiced system; and repeated, glaring, untoward and unexplained nonfeasance, to put it mildly,

---

[16]    In another striking juicy detail of the evidence, another of the FBI-alleged suicide pilots, Walid al-Shehri, whose picture was in the world-wide mug shot broadcast of the infamous 19, turned up in a BBC investigation quite alive (as several more of the named nineteen apparently did also), said to be working as a pilot for Moroccan Airlines (!); whence he invited investigators to come see him for themselves; but, from America the aggrieved attack victim, none did...

with respect to uncounted routine tasks and practices, normal communications, logical reactions to aeronautical and other events and phenomena, command and coordination awareness, and disciplined responses to occurrences prepared for in planning and training. All of which should have and normally would have taken place; and at all odds would have thwarted the attack if it came, or at least minimized its impact; and all of which failed on this fateful day.

These disastrous failures, on the part of a substantial if indeterminate number of official military and civilian personnel, operating at different levels under the defendants' direct or ultimate command, logically would and should have given rise to an immediate, cosmic uproar, and determined public action by the defendant commanders to identify those responsible and hold them to account; but that never happened. Instead, the calamity was papered over with misdirection, distraction, vague excuses, cries for vengeance and double-talk about a "War on Terror"; and finally in an official report, prepared under hopelessly compromised circumstances, and shot through with omissions, distortions and outright falsehoods; a grand whitewash.

If such proofs and inferences are added to the brute facts alleged: that defendants (including the unknown named co-conspirators) knew an attack was likely, and then on that day knew the plane was coming; that the interceptors didn't show up, and no other defense was mounted (despite the E-4B, aloft over the city);

and that no warning was given to save those in the odd (indeed quite *implausible*) first-floor target area of the Pentagon, the "denialism" in the District Court's Decision is plain to see. With those facts and all the evidence behind them, how can it fairly or honestly be said—except out of horror and revulsion at the very idea that such a monstrous betrayal could ever occur—that plaintiffs have failed, to quote *Iqbal*, to plead "factual content that allows the Court to draw the reasonable inference that the defendant(s are) liable for the misconduct alleged"? 129 S.Ct at 1949.

The inference of liability was not drawn but rejected, because the District Court did not believe the misconduct occurred; because he does not believe it possible for it to occur, regardless of the facts, as he clearly states. So it appears he is not really making an *Iqbal* judgment, as such; i.e, not identifying the factual allegations which are conclusory (except to say they all are), and therefore disentitled to the presumption. Moreover, he avoids coming to grips with plaintiffs' inferences, particularly those directly alleging betrayal.

Rather, the Court simply believes, without need to parse any of the facts alleged, and he finds, that the claims of betrayal—even by such men as later took the country into hideous, devastating wars, slaughtering tens and hundreds of thousands of innocent people; making refugees, torturing prisoners; mindlessly destroying villages, neighborhoods, infrastructure, weddings; setting whole

populations at each others' throats; undoubted war crimes on a broad scale, and open-ended, wholly illegal military occupation of faraway lands, *all based on lies!* Which were lies by these defendants, for which "the new Pearl Harbor" of 9-11 prepared the ground—are "simply implausible", and frivolous, even if the facts are taken as true.[17] And it is clear that, in the words of the older, deeper standard of *Conley v Gibson*, for Judge Chin there could be no set of facts which would entitle these plaintiffs to relief

It has been wisely observed that, when evident wrongdoing is explained away and denied in official accounts, you're either a conspiracy theorist or a coincidence theorist. Here—once the unthinkable is thought—the principle of Ockham's razor also applies. This Court must find the constitutional gumption to insulate itself from the Horror of the Very Idea, intellectually, fairly, for long enough to analyze and judge the actual narrative in its evidentiary concreteness— so heavily Freighted not just with arguable facts, or facts subject to proof, but

---

[17]   Nor should it be thought that "false flag" operations on a grand scale, like the Reichstag fire, are at all *implausible*, or that U.S. officials are above such an enterprise. 'Remember the Maine'; remember the border incident in 1846 that the U.S. under President James Knox Polk used as a pretext to invade Mexico, in a "war" that led to U.S, annexation of half its territory (including California, Colorado, Arizona, New Mexico, etc.); and remember the phantom incident in the Gulf of Tonkin, in 1964, which President Johnson used as an excuse to begin the depraved, disastrous no-holds-barred assault against Viet Nam. Remember that these very officials schemed with President Bush in 2002 on a means to "wrongfoot" Saddam Hussein, by painting a plane with United Nations symbols, and flying it over Iraq in hopes it would be shot at, providing an excuse to attack. More recently, Seymour Hersh reported on discussions held in defendant Cheney's office, in 2008, which were said to have promoted a plan to use disguised gunboats, manned by Navy Seals, to initiate a firefight with U.S. forces in the Persian Gulf, providing the U.S. with an excuse to attack Iran.

myriad concluded, facts, with legitimate inferences—set forth in support of the false flag/inside job/conspiracy allegations.

## III.     The Court compounded its erroneous decision by dismissing the Complaint with prejudice, instead of giving plaintiffs Leave to Amend.

Under the very rule, leave to amend a pleading "shall be freely given when justice so requires;" *Fed.R.Civ.P 15(a)*, and it is said that the "policy of favoring amendment to pleadings should be applied with *extreme liberality*." *D.C.D. Programs., Ltd. v. Leighton,* 833 F.2d 183, 186 (9th Cir. 1987) (Emphasis added); *Day v Morgenthau*, 909 F.2d 75, 78 (2nd Cir. 1990); See, *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct 227 (1962).

Here the District Court obviously never considered the possibility that this Complaint could be cured of its curse; justice in his mind required suppression of the very idea of the plot, not the slightest degree of indulgence of it.  So he did nothing in the way of analysis of any specific supposed shortcomings, despite the great length and cogency of the factual narrative in the Complaint, and the large trove of additional factual material placed before him in plaintiffs' Appendix on the motion to dismiss.

Notwithstanding the normal rule that sufficiency of a Complaint must be assessed from within its 'four corners', we say the Appendix submitted on the motion was a perfectly reasonable and proper response to the claim that this Complaint was frivolous, and also a solid indication that a large amount of

additional factual material was available to be marshaled in support of the horrific claims. The District Court had authority under the rule to open the matter to include the Appendix materials, and thereby convert the motion into one for summary judgment, per the last section of Rule12(b)—or, as we urged, simply accept it as evidence against the charge of frivolousness, as well as showing that we would be able to strengthen our showing, if he showed us its faults.

But the Court was not remotely of a mind to entertain these claims on any basis—as shown in his hasty dispensation with the *Iqbal*-mandated analysis of the facts—so these issues never arose. In these circumstances, there is no fair question but that plaintiffs should have been granted an opportunity to amend the Complaint; that is elementary.

# CONCLUSION

*This is an experiment in truth. Its particular truth is a journey into darkness. If we go as far as we can into the darkness, regardless of the consequences, I believe a midnight truth will free us from our bondage to violence and bring us to the light of peace.*

— Rev. James Douglass, "JFK and the Unspeakable: Why He Died and Why it Matters", p.xix

The plaintiffs' conspiracy theor(ies) and their factual support are broadly articulated in the Complaint, and the improved or enhanced version of it outlined here; and spelled out still further in the Affidavit of Professor David Ray Griffin and the other affidavits and additional evidentiary materials in the plaintiffs' Appendix. Where plaintiffs were clearly entitled to amend if the District Court found the factual support for their allegations inadequate, and where they clearly had a right to make their best showing, and record, in meeting the claim their case was frivolous, it only makes sense to deal with the long-developing, emerging narrative on an up-to-date basis. In any version, we are far beyond the threshold of the "merely possible", comfortably into what must be taken as "plausible" within the *Iqbal* rule—because it is well-supported by facts, clearly not frivolous, and entitled to be heard.

Likewise, the claims put forth—and particularly the showing (which can also be hugely expanded) that no honest investigation of what happened has occurred, and the official one was fraudulent—were further validated by the long

47

list of eye-witnesses, scholars. scientists, analysts, reporters, researchers, expert investigators, pilots and other thoughtful citizens, who support and vouch for various practical, personal and expert factual parts on which the theories rest, and support the charge of official cover-up. Especially in light of such broad, solid and respectable foundations, where the Memorandum Decision contains no analysis of how the facts alleged, or any crucial portion of them, are "disentitled" to the normal, traditional presumption of truth, the judgment below that the Complaint is frivolous is itself frivolous.

Whatever else can be said can only be addressed to the conscience of this Court, as it reviews this ill-founded, reactionary decision in the court below. A fair, dispassionate reading of the Complaint (let alone the Griffin Affidavit and other materials in the proofs), shows clearly there is a broad, powerful, wholly factual evidentiary foundation for the plaintiffs' charges, including the cover-up charge, clear connections of the defendants personally to the events in question, and complete, telltale failure by them in the aftermath to investigate and account for the flagrant breakdown of the national defense they were in command of and responsible for.

We reprised these points in answering the motion to dismiss, adding an Appendix loaded with additional evidence, and testimonials to the seriousness, substance and soundness of the allegations, against the claim the Complaint was

frivolous.  We showed thereby, as we have shown here, that the Complaint—as it shows itself—is anything but frivolous, or baseless or delusional, the abhorrence of the District Judge or anyone else notwithstanding.  The rule in *Iqbal*, as we have also shown, is no bar at all to the further progression of the inquiry.

Instead, the real possibility that an atrocious, murderous and surely treasonous betrayal of our country, as well as of the plaintiffs and the others in the building(s) that were bombed, truly occurred—and that a great, harrowing judicial inquiry must be had to get to the bottom of it—has been shown, well within any stricture ordained in *Ashcroft v Iqbal*.  In honesty, it must be accepted by this Court, with all its consequences; come what may.

WHEREFORE, the Court is respectfully asked:

+ To find outright that the Complaint before it is valid, and its claims adequately supported, within the rule prescribed in *Ashcroft v Iqbal*; and thereon reverse the judgment of the District Court, vacate its Memorandum Decision of March 16, 2010, and remand the matter for further proceedings leading to trial; or,

+  To rule that the District Court's ruling that plaintiffs' Complaint is frivolous was erroneous in law, and must be reversed, and to remand the case to the District Court with directions that, in any decision to dismiss for 'implausibility', or frivolousness, the Court's analysis must 'identify the allegations

disentitled to the presumption of truth', under the mandate of *Iqbal*, and reasonably explain why those remaining will not support the claims alleged; and,

+ To instruct the Court below, in the event it again finds the Complaint is subject to dismissal, that plaintiffs must be given a fair opportunity to amend before a final dismissal is enacted.

Plaintiffs request such other and further relief as may be deemed just and appropriate in the premises.

Respectfully submitted,

DATED: July 15, 2010
Brooklyn, New York

/S/ [Signature]


On the Brief:

Dennis Cunningham, Esq
115-A Bartlett Street
San Francisco, CA 94110
(415)-285-8091

William Veale, Esq
2033 North Main Street, #1060
Walnut Creek, CA 94596
(925)-935-3987

Mustapha Ndanusa, Esq
26 Court Street, Ste 603
Brooklyn, NY 11242
(718) 825-7719

Attorneys for Plaintiff-Appellants

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1.  This brief complies with the type-volume limitation of *Fed. R. App. P. 32(a)(7)(B)* because:

    **X** this brief contains 10,522 words, according to 'statistics' registered by MSWord, excluding the parts of the brief exempted by *Fed. R. App. P. 32(a)(7)(B)(iii), or*

2.  This brief complies with the typeface requirements of *Fed. R. App. P. 32(a)(5)* and the type style requirements of *Fed. R. App. P.* 32(a)(6) because:

    **X** this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Times New Roman font size 14 point (footnotes in 12 point)

Dated: July 14, 2010
Brooklyn, New Yok

/s/ [Signature]
Mustapha Ndanusa, Esq.
Attorneys for Plaintiff-Appellant APRIL GALLOP and ELISHA GALLOP, a minor

**CERTIFICATE OF COMPLIANCE WITH SECOND CIRCUIT RULE OF APPELLATE PROCEDURE 32(A)(1)(F)**

1. The PDF version of this brief has been scanned for viruses using Norton 360 AntiVirus and no virus has been detected.

Dated: July 15, 2010
Brooklyn, New Yok

/s/ [Signature]
Mustapha Ndanusa, Esq.
Attorneys for Plaintiff-Appellants APRIL GALLOP and ELISHA GALLOP, a minor