# 10-1241

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

———————————

**APRIL GALLOP, individually and for her minor Child, E.G.**

*Plaintiffs-Appellants*

– vs. –

**RICHARD CHENEY, former Vice President of the United States,
DONALD RUMSFELD, former U.S. Secretary of Defense,
General RICHARD MYERS, (Ret.),**

*Defendants-Appellees*

– and –

**JOHN DOES Nos. 1-X, all in their individual capacities**

*Defendants*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

———————————

**APPELLANTS' MEMORANDUM IN RESPONSE TO THE COURT'S APRIL 27, 2011
ORDER IMPOSING SANCTIONS**

———————————

MUSTAPHA NDANUSA
26 COURT St., Suite603
Brooklyn, New York 11242
(718) 825-7719

DENNIS CUNNINGHAM
115-A Bartlett St.
San Francisco, CA 94110

WILLIAM W. VEALE
2033 North Main Street, # 1060
Walnut Creek, CA 94596
(415)-285-8091
*Attorneys for Plaintiffs-Appellants*

ALICIA SIMMONS
Assistant United States Attorney
86 Chambers St, 3rd Floor
New York, New York 10007
(212) 637-2697
*Attorney for Defendant-Appellees*

Table of Contents

Page No.

TABLE OF AUTHORITIES……………………………………………………………ii

PRELIMINARY STATEMENT………………………...…………………….…….…….1

ARGUMENT……………………………………………………………..………2

I.      AN ORDER IMPOSING SANCTIONS REQUIRES A DETAILED SHOWING OF
        BAD FAITH, WHICH WAS NOT MADE.…………......................………….…..……...2

II.     THE FINDING THAT THE APPEAL IS FRIVOLOUS IS ILLEGITIMATE AND
        UNFOUNDED, AND IT CANNOT FAIRLY OR REASONABLY BE MADE THE
        BASIS FOR SANCTIONS ...……………………………………….………….....6

        A.  The Court Did Not Reasonably Assess the Facts in the Complaint ………....6

        B.  The Facts Alleged in the Complaint Fully and Reasonably Support the
        Conspiracy Charges …………….…………………………………………….....9

        C. Both This Court and The Court Below, In Discounting the Plaintiff's Own
        First-Hand Evidence That No Airliner Crashed Into The Pentagon, Engaged In
        Improper Fact-Finding, On A Key Allegation, In Violation of Basic Due Process.
        This Ruling Was An Essential Mechanism of The Erroneous Judgments in Both
        Courts……………………………………………………………….....……....16

CONCLUSION…………………………………………………………………....……..19

RULE 32(a)(1)(f) Certificate……………………………………………...……….…….22

i

**Table of Authorities**

**CASES**

*Eisenman v. Green*, 204 F.3d 393 (2d Cir.1999)……………………………………...4

*Advanced Magnetic Closers Inc. v. Rome Fastener Corp.*, 607 F.3d 817, 833 (Fed Cir, 2010)……………………………………………………………...……………4

*Ashcroft v. Iqbal*, __U.S.__, 129 S.Ct 1937 (2009)……………………………...6

*In re Dellinger, et al, and Kunstler and Weinglass (R.I.P.)*, 461 F.2d 389, 400 (7th Cir. 1972)………………………………………………………………………….20

**RULES**

Rule 8, F.R.Civ P…………………………………………………………………...5

## PRELIMINARY STATEMENT

Respondents, plaintiff and counsel, to answer the Order to Show Cause in the Court's Decision of April 27, 2011, herein, state and declare that the said Order, like the substantive decisions here and below, lacks valid legal grounds, and denies due process and fundamental fairness, and must be vacated. This Response contains the following materials, in addition to this Memorandum:

1. Affirmation of Dennis Cunningham Esq. as lead counsel for plaintiffs, and principal author of the Complaint and the other pleadings in the case, including this one, and the Motion for Recusal.

2. Affirmation of plaintiff April Gallop, recounting and attesting to her experience and first-hand knowledge of events at the Pentagon on 9/11.

3. Affirmation of Mustapha Ndanusa, Esq. who has served as local counsel for plaintiffs since shortly after the Complaint was filed, and who presents in an Appendix the following additional materials:   Cover of Operation Amalgam Virgo Proposal (showing foreknowledge of the attacks, specifically by Bin Laden and preparing for same); Verifiable Media Report on 911 (documenting several publicly known instances of foreknowledge and connection of U.S. officials to the attacks; Affidavit of Engineer affidavit of Steven Dusterwald, sworn to on July 11, 2011 (attesting to the improbable collapse of the WTC buildings, leading to the belief that the attacks were homegrown; *Active Thermite Material Discovered in*

1

## PRELIMINARY STATEMENT

Respondents, plaintiff and counsel, to answer the Order to Show Cause in the Court's Decision of April 27, 2011, herein, state and declare that the said Order, like the substantive decisions here and below, lacks valid legal grounds, and denies due process and fundamental fairness, and must be vacated.  This Response contains the following materials, in addition to this Memorandum:

1.  Affirmation of Dennis Cunningham Esq. as lead counsel for plaintiffs, and principal author of the Complaint and the other pleadings in the case, including this one, and the Motion for Recusal.

2.  Affirmation of plaintiff April Gallop, recounting and attesting to her experience and first-hand knowledge of events at the Pentagon on 9/11.

3.  Affirmation of Mustapha Ndanusa, Esq. who has served as local counsel for plaintiffs since shortly after the Complaint was filed, and who presents in an Appendix the following additional materials:   Cover of Operation Amalgam Virgo Proposal (showing foreknowledge of the attacks, specifically by Bin Laden and preparing for same); Verifiable Media Report on 911 (documenting several publicly known instances of foreknowledge and connection of U.S. officials to the attacks; Affidavit of Engineer affidavit of Steven Dusterwald, sworn to on July 11, 2011 (attesting to the improbable collapse of the WTC buildings, leading to the belief that the attacks were homegrown; *Active Thermite Material Discovered in*

1

*Dust from the 9/11 World Trade Center Catastrophe* publication in Open Chemical Physics Journal, 2009, 2, 7-31(publication examining the existence of nanothermite at the WTC site and therefore evidence of US involvement in the attacks of 9/11).

4.  Affirmation of William Veale Esq. co-counsel, spelling out the factual matters learned before and since the Complaint was filed, which support the conspiracy and "false flag" or "inside job" allegations, as well as his continuing good faith belief that the claims in this case are true.

These materials are submitted to demonstrate to the Court the rational, non-cynical, non-deluded, factual basis for the allegations and claims of conspiracy included in the Complaint, which we deny were frivolous, and the reasonable decision of counsel to prepare and file it, and to appeal when it was summarily dismissed.  We also present legal argument that the decision to propose sanctions is similarly, derivatively, erroneous, as follows:

**ARGUMENT**

## I.  AN ORDER IMPOSING SANCTIONS REQUIRES A DETAILED SHOWING OF BAD FAITH, WHICH WAS NOT MADE.

There can be no doubt the Court has the authority, as it notes, to punish a litigant and her counsel for filing an appeal that is truly frivolous.  But it is equally certain that, where they are exercising a similarly undoubted right to sue the

Country's highest officials for conspiracy and terrorism, plaintiff and her counsel are absolutely entitled, as a matter of Due Process, to have the validity of their allegations assessed fairly, thoroughly and dispassionately by the Court. Of a piece with that right, they surely are entitled to a similarly detached and objective determination of the Government's accusation that the case is frivolous, if that is to be the grounds for dismissing the allegations; and to fair consideration of their contrary evidence.

*A fortiori*, where it is clear the law will require a further finding of Bad Faith before the sanctions invoked by the Court will lie, plaintiff's side is surely entitled to fair hearing before being assessed severe punishment for filing an appeal that is adjudged frivolous. But it comes to the same thing: if we don't get fair consideration of our response to the claim that our case is frivolous, the judgment that we should be punished for bringing it will also be unfair, and unfounded

The facts in the Complaint—and by extension, those in the plaintiff's Appendix in the district court, and the still steadily growing quantity of factual information, on the one hand, and informed and expert analysis and opinion on the factual basis for the inferences of a 9/11 conspiracy, on the other—all solidly support the plaintiffs' charges. As it has accumulated, this material has been offered and asserted by plaintiffs in further support of the Complaint, and in refutation of the defense claim the complaint was frivolous—and it obviously

3

modifies on the question of whether we had and should still have a right to leave to amend, if the instant allegations could be deemed insufficient. But the court below disdained this material, and this Court has not seen fit even to acknowledge its existence.

This aspect, the right to introduce extrinsic evidence to show non-frivolousness, and an ability to amend, thus also was not fairly assessed by this Court or the district court, under Rule 8, or *Ashcroft v. Iqbal*, or the standards, obviously evolving after *Iqbal*, which the law will apply to a 'frivolousness defense', as it were, in order to counteract subjectivity and emotion in such judgments.[1]

Moreover, the standard for culpable frivolousness in this Circuit will clearly require a finding of bad faith. Thus, in 1999, the Court said,:

> To ensure . . . that fear of an award of attorneys' fees against them will not deter persons with colorable claims from pursuing those claims, we have declined to uphold awards under the bad-faith exception absent *both clear evidence that the challenged actions are entirely without color, and are taken for reasons of harassment or delay or for other improper purposes and a high degree of specificity in the factual findings of the lower courts.* *Dow Chem. Pacific Ltd. v. Rascator Maritime S.A.,* 782 F.2d 329, 344 (2d Cir. 1986) (emphasis added) (internal citations, quotation marks, and brackets omitted); see also *Schlaifer Nance [& Co. vs. Estate of Warhol]*, 194 F.3d at 338 ("*The Court's factual findings of bad faith must be characterized by a*

---

[1]    The claims against Ashcroft and Meuller in *Iqbal* were not ruled frivolous in this Court or the Supreme Court, which said only that they lacked non-conclusory factual support. See generally, Charles M. Yablon, The Good, the Bad, and the Frivolous Case: An Essay on Probability and Rule 11, 44 U.C.L.A L. Rev. 65, 66,94 (1996) "[C]ourts have had a fair amount of trouble developing standards for distinguishing frivolous cases from ordinary losers."

*high degree of specificity.*" (internal quotation marks omitted)); *MacDraw, Inc. v. CIT Group Equip. Fin*., 73 F.3d 1253, 1262 (2d. Cir. 1996) (vacating imposition of sanctions because the District Court "engaged in no detailed consideration of what conduct by plaintiff's counsel satisfied the bad faith requirement").

*Eisenman v. Green*, 204 F.3d 393 (2d Cir.1999) (Emphasis added). Last year the

Court in the Federal Circuit re-affirmed this principle:

> Under *the Second Circuit's strict standard*, the district court abused its discretion by sanctioning Mr. Jaroslawicz under 28 U.S.C. § 1927. The district court may have had good reason to sanction Mr. Jaroslawicz, but it failed to find that Mr. Jaroslawicz acted in bad faith. The Second Circuit's precedents make clear that *the court meant what it said*: "[T]he court's factual findings of bad faith must be characterized by a high degree of specificity." *Schlaifer Nance [& Co. vs. Estate of Warhol]*, 194 F.3d at 338 (internal quotation marks omitted) (emphasis added). Here, the district court is not specific, never using language tantamount to a finding of bad faith nor mentioning that bad faith is a requirement for 28 U.S.C. § 1927 sanctions. * * * *
>
> These statements (by the contemnor) cannot equate to finding that Mr. Jaroslawicz acted in bad faith. Rather, the statements suggest that a reasonable attorney would have known not to proceed with trial. But *in the Second Circuit, "[28 U.S.C] § 1927 requires subjective bad faith of counsel," not objective unreasonableness. MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.,* 73 F.3d 1253, 1262 (2d Cir. 1996). Because the district court failed to identify with specificity the bad-faith standard and used language suggesting an objective standard, we are not convinced that the district court found Mr. Jaroslawicz acted in bad faith. The district court thus did not satisfy the *Second Circuit's requirement for "a high degree of specificity in the factual findings*." *Dow Chem.[Pac. Ltd. v. Rascator Maritime S.A.*], 782 F.2d at 344.

*Advanced Magnetic Closers Inc. v. Rome Fastener Corp.*, 607 F.3d 817, 833 (Fed Cir, 2010)(Emphasis added).

The Court here, however, rather than breaking down the offending pleading to demonstrate bad faith, and without identifying any allegations it considers "frivolous", "clearly baseless", "fanciful", "fantastic, "cynical", or "delusional", and why, substitutes its own broadside conclusions. It states the principle that "[a] court may dismiss a claim as 'factually frivolous' if the sufficiently well-pleaded facts are 'clearly baseless'—that is if they are 'fanciful,' 'fantastic' or 'delusional'; (Decis, p.5), and it says our claims are "cynical", and "delusional", and, cryptically, that our "few conceivably 'well-pleaded' facts'" are frivolous anyway, period, without specifying them. Scornfulness aside, this does not come near to providing "clear evidence that the challenged actions are entirely without color, and are taken for reasons of harassment or delay or for other improper purposes, and a high degree of specificity in the factual findings," (*Eisenman, supra*) as required by the precedents cited, to support punitive action in this Circuit. This alone requires cancellation of the punishment.

## II. THE FINDING THAT THE APPEAL IS FRIVOLOUS IS ILLEGITIMATE AND UNFOUNDED, AND IT CANNOT FAIRLY OR REASONABLY BE MADE THE BASIS FOR SANCTIONS.

### A. <u>The Court Did Not Reasonably Assess the Facts in the Complaint</u>.

Respondents say again the Complaint was not frivolous, nor was the appeal. The assessment made of the factual allegations, in both courts, was inadequate, and out of compliance with Rule 8, F.R.Civ P. New rules of pleading announced by

the Supreme Court in *Ashcroft v. Iqbal*, __U.S.__, 129 S.Ct 1937 (2009), prescribe that "conclusory" allegations which are "disentitled" to be taken as true must first be identified, and set aside,[2] and the court then determines whether the "framework" of charges against the defendants is supported by the remaining foundation, if any, of well-pled concrete facts.[3]

Here, no such inventory was performed by either court—though both went out of their way, as discussed further below, to find concrete facts <u>against</u> the plaintiff's first-hand testimony—and the strength of plaintiffs' non-conclusory factual assertions, entitled to be taken as true, was ignored. In Respondents' view, as noted, this failure arose from an untoward, actionably biased judicial response to theories of conspiracy put forth by plaintiffs; and we believe the Order to Show Cause is similarly infected.

Plaintiffs alleged that some of the Country's highest officials acted together to cause or help the 9/11 attack to succeed, in order to bring about "a new Pearl Harbor"; so that a shocked population would acquiesce in unprecedented military adventures, suppression of Constitutional and civil rights, and other changes in

---

[2]    "We begin our analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal, supra*, 129 S.Ct at p.1951.

[3]    "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal, supra*, 129 S.Ct at p.1950.

governance desired by the radical neoconservative political movement, focused on global dominance, that defendants were leaders of; and that is indeed what happened.  It is apparent that the members of the Panel—despite their unequivocal affirmation that we had every right to bring such a complaint—could not abide it once it came forth.

Thus they ignored the specification requirement announced in *Iqbal*, and went directly on to condemn our appeal as frivolous.  The Panel ruled further that we should so clearly have known the appeal had "no chance of success", that we should be sanctioned simply for filing it.

So it is plain that the root of the matter is the shared feeling of the judges in both courts that plaintiffs' charges: that the defendants used the authority of high office to engineer a standdown of U.S. air defenses, and the defense system at the Pentagon, which allowed the planes to get through to their targets, was so "implausible", in a word—along with all the other words—that the Complaint would be ruled frivolous, without identifying the offending allegations and without analysis, and the appeal from its dismissal as well.  While the Court said plainly that "a plaintiff certainly may allege that the most senior members of the United States government conspired to commit acts of terrorism against the United States..." (Decis, p.5); it still went on to hold that where we made just such allegations,

8

with extensive facts alleged to support each claim, and where the District Court dismissed the Complaint without following the requirements of Iqbal, our appeal "was 'brought without the slightest chance of success', and therefore should not have been brought at all;" (Decis, p.8) and to prescribe a stiff fine ($15,000).

In making this ruling, the Panel ignored the Supreme Court's clear statement about such a case, in setting down the *Iqbal* rule:

> To be clear, we do not reject these bald allegations on the ground that they are unrealistic or nonsensical... (or) too chimerical to be maintained. *It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature*, that disentitles them to the presumption of truth.

129 S.Ct at 1951 (Internal cites omitted; emphasis supplied). Instead, the Panel focused on what they clearly felt was the "extravagantly fanciful nature" of the allegations, to the point where the assessment of their "conclusory" character *vel non*, prescribed by the *Iqbal* court, was dispensed with—even as it had been in the district court. Respondents aver this was a fatal flaw in both decisions, evidently brought about by an angry pre-judgment, which here vitiates both the decision and the rule to show cause.

## B.  The Facts Alleged in the Complaint Fully and Reasonably Support the Conspiracy Charges.

Plaintiffs' causes of action under Bivens, for violation of rights under the First, Fourth, Fifth, and Ninth Amendments, and conspiracy, and under federal common law, for conspiracy to cause wrongful death, great bodily harm, terror,

9

and other injuries, differ from the claims raised in _Twombly_ and _Iqbal_, because the wrongful activity alleged in those cases gives rise to liability only if an unlawful conspiracy is proved. In the present case the underlying activity is unlawful in itself, and Plaintiffs need only prove agreement or concerted action by two or more of the Defendants. Plaintiffs' third cause of action for international terrorism does not require any proof of conspiracy, and cannot be dismissed on the ground that a conspiracy has not been adequately alleged.

With regard to the allegations of conspiracy, plaintiffs in 40-some paragraphs of their complaint have pleaded a great many concrete facts, each of which adds to the evidence of conspiracy. The allegations supporting plaintiffs' theory show the non-"conclusory" and "plausible" factual framework which led us and allowed us to bring it to the Court. A quick review will confirm this:

The coordinated counter-terrorism operations and programs of the U.S. Government during the Clinton Administration were de-emphasized and largely abandoned, according Richard Clarke, the chief of counter-terrorism, by President George W. Bush and defendants Cheney and Rumsfeld when they reached office. Clarke has described how he was increasingly excluded from strategy meetings of the Administration's inner circle, and unable to gain their attention to his growing

concern with a possible attack. [4]  The President put defendant Cheney formally in charge of all counter-terrorism activities in May, 2001; and Cheney seems to have ignored Clarke's concerns thereafter.  Complaint, ¶16.

Obviously as a result of this new outlook, the increasingly pointed warnings of a possible, and then imminent, attack, received through intelligence channels as the year wore on, were downplayed and disregarded in the inner circle.  Indeed, it has been knowledgeably concluded that, faced with many warnings ("The system was blinking red," CIA Director George Tenet told the 9/11 Commission), "…the President *decided* to do nothing"—and that, "It would be hard to find words adequate to describe the full range and amplitude of the nothing that he did"[5]

Indeed there is a good deal of information indicating that <u>less</u> than nothing was done; particularly in several accounts of leads developed in FBI field offices, showing, e.g, that some of the suspects later identified by the Government as among the hijackers were pursuing flight training.  These reports were quashed at FBI headquarters; apparently all by the same high supervisory official.  Then, after the warnings of an attack went unheeded, the nation's air defenses—after years, indeed decades, of constant practice, and routines that could and did regularly put

---

[4]   Richard Clarke, "Against All Enemies: Inside America's War on Terror"  (Free Press, First Edition March 22, 2004)

[5]   See, "Secret Intelligence and the 'War on Terror'", by Thomas Powers, *The New York Review of Books*, 12/16/04, p.51 (Emphasis by author).  As Mr. Powers put it, "My own preliminary working explanation is that for reasons of his own the President *decided* to do nothing.  Why?  Historians will be occupied for many years before they come to agreement on the answer to that question." (Id.)

fighter-interceptors aloft over any spot in North America within a very few minutes—together with the totality of defenses at the Pentagon also, *all failed at once*.  The attackers got through to three targets, and many lives were lost; and many more were damaged forever, and the world was changed. [6]

The President was in a 'photo op' in a Florida elementary school classroom when it happened, and defendant Cheney was (safe) in the White House bunker, with then Secretary of Transportation Norman Mineta at his side, receiving updates about a third hijacked plane, then headed towards Washington, from a young military aide.  As Mineta testified before the 9/11 Commission, at about 9:25 or 9:26 a.m. the young man said the plane was "50 miles out", a few minutes later, "30 miles out", and finally he came in and said, "The plane is 10 miles out", and went on to ask, "Do the orders still stand?" Mineta said, "The Vice President turned and whipped his neck around and said, 'Of course the orders still stand. Have you heard anything to the contrary?'", and the young man left.  The plane allegedly struck the Pentagon a few minutes later.

Because the Pentagon is the most heavily defended building in the world, and Andrews Air Force Base with interceptor jets is nearby, the most reasonable or "plausible" interpretation of the above exchange is that the order must have been

---

[6]    It should be mentioned here that there is also copious evidence, discussed elsewhere in these papers, showing that the collapse of the (three) towers in New York was also brought about by pre-planted explosives and incendiaries, not by planes and fires…

not to shoot the plane down. Otherwise, the plane would surely have been shot down. But the Commission did not pursue the point, and no further inquiry was ever conducted by any other military or governmental agency to determine what Cheney's order was, or to fix responsibility for the failure to shoot the plane down. These allegations provide plausible, non-conclusory evidence that Vice President Cheney had confirmed an air defense stand-down order regarding the plane headed for the Pentagon. To the extent that others carried out the order, and engaged in protecting such information from public disclosure, a conspiracy is made out. The fact the 9/11 Commission engaged in no coherent follow-up, and did not even describe include Mineta's testimony or this incident in the 9/11 Commission Report, plausibly suggests that the 9/11 Commission was part of a conspiracy, at least to cover up Cheney's apparent direction of a stand down.

This incident is not mentioned in either of the decisions in this case. To our knowledge Cheney himself has never been questioned about it. But Mr. Mineta told plaintiffs' counsel in 2009, in person, that he stood by his account, and would wait for an opportunity to testify about it, in a lawsuit, this lawsuit. (But of course it won't happen if there's no lawsuit…)

But Cheney himself has confirmed being in the bunker, and getting the updates, and then hearing "the Pentagon's been hit." He spoke about this on the air with the late Tim Russert, a few days after the event, and told the story again in a

speech to the American Enterprise Institute in May, 2009. (Complaint, ¶31) In between, the 9/11 Commission reported that he never even reached the bunker until about 10:00 a.m., long after the Pentagon was hit, supposedly at 9:38. Nobody, not the Commission, not the Congress, not the Press, has had anything to say about this contradiction; nor about Mineta's striking testimony about an apparent standdown order.

And, as alleged in the Complaint at ¶25, and more fully in our Petition for Rehearing—which also seeks to refute the judgment of frivolousness—there are also contradictions in the various accounts given by defendants Rumsfeld and Myers of their locations, movements and "situational awareness" during the crucial period that morning, where these were altogether in conflict with further evidence from Richard Clarke. Mr. Clarke wrote in his book that he convened a teleconference of the various highest officials concerned with the emergency, from the White House, just a few minutes after the second tower was hit in New York at 9:03 a.m. Clarke said he watched both defendants take their seats in the secure room at the Pentagon—just what you'd expect would happen at such a moment, obviously.[7] His account has not been publicly questioned. (Complaint, ¶45).

Obviously also, the same information Cheney was getting in the bunker with Mineta was available in that room—and in the video conference itself, obviously,

---

[7] Clarke, "Against All Enemies", p.___

with the towers hit and burning in New York—about the plane, and soon enough a second plane, out of contact and headed back towards Washington. Obviously there was still plenty of time to ensure the presence of interceptor jetsto prevent another attack, and the readiness of other defenses, now that the suicidal intentions of the hijackers were clear; and there was time to warn the people at risk in the various high-potential targets, like the Pentagon, to move to safety.[8]

The tape of that teleconference has been kept secret; and apparently the 9/11 Cover-up Commission never asked for it. And there are reportedly some 85 surveillance tapes from sites at or near the Pentagon also being withheld, as we alleged. (Complaint, ¶ ¶4 and 40(b))  And there are no pictures of the wreckage of a huge airliner crashed into the side of the Pentagon, anywhere. (complaint, ¶¶39, 40(a), and (c)). The refusal to release such crucial information provides plausible evidence of conspiracy, and cover-up. And afterwards, the defendant highest-level commanders clearly had no impulse and made no effort to find out what had gone so disastrously wrong with America's vaunted defenses, and to conduct an urgent, detailed inquiry to determine who was responsible, and hold them to account. The defendants' absolute lack of interest afterwards in learning how the Country's defenses had failed is perhaps the most telling single fact among the myriad which

---

[8]    As to the 'second' plane, actually the fourth plane of the day, said to have crashed in a field in Pennsylvania after passengers fought back against hijackers, there is a very solidly supported "alternate historical reality", shared by a substantial number of sentient Americans—and supported by a wealth of striking evidence—in which the fighters do finally get to this last of the hijacked planes, after a "shoot-down" order issued by the Vice President, and shoot it down.

support the 'framework' of plaintiffs' conspiracy claims in this case. All of these facts are told in our Complaint.

**C. Both This Court and The Court Below, In Discounting the Plaintiff's Own First-Hand Evidence That No Airliner Crashed Into The Pentagon, Engaged In Improper Fact-Finding, On A Key Allegation, In Violation of Basic Due Process. This Ruling Was An Essential Mechanism of The Erroneous Judgments in Both Courts.**

There is another serious error which further shows the invalidity of the judgments of frivolousness, in the Court's dismissal from consideration of the first-hand, eye-witness testimony of April Gallop, that there was a bomb or bombs that went off, and no sign of an airliner crash, inside or outside of the building. In fact, the Court was obliged to take such allegations as true, under Rule 8.

Ms. Gallop was sitting about 40 feet from the front wall, where it is said the plane hit, and she went out of the building through that wall where it was blown off. Neither she nor anyone else inside the Pentagon saw a giant airliner or enormous fiery hunks of it come roaring into their space at 500 mph, nor a large fireball of burning jet fuel and plane wreckage everywhere. What she says happened was: explosions or a bomb or bombs went off, she was hit in the head and knocked out briefly, got up, got her baby and made her way out the front, with others, along where the pictures show the front wall on the ground floor was blown off. Her testimony is supported by the lack of photographs showing wreckage, the testimony of others present, and the refusal of the Justice Department to release

16

any of the 85 videotapes, which should show conclusively if an airliner did or didn't hit the Pentagon.

When defendants have complete control of the evidence and refuse to release it, any uncertainties should be resolved in favor of the plaintiffs at the pleading stage. The fact that others said the same thing was also alleged in the complaint (¶33), but ignored in the decision(s). It was also said on the air by a CNN reporter at the scene.[9] Ms. Gallop's patently <u>non</u>-conclusory factual averments are amply supported by other strong evidence, and not dismissible or disregardable, under *Iqbal* or otherwise, rulings to the contrary by both courts notwithstanding; and she was entitled to have them taken as true, not disparaged and cast aside.

Indeed, the fact is that the Court has bottomed its entire decision on unauthorized fact-finding. It refers again and again to facts asserted in the 9/11 Commission Report, and relies on them as if these were the unassailable truth about the events in question. But the Report is wholly disputed, shot through with omissions, distortions and falsehoods, in aid of the cover-up, and it has been broadly discredited and impugned, even by its own co-chairmen.[10] It is the subject of an explicit, fact-intensive allegation by plaintiff that it was and is an artifact of

---

[9] See Affirmation of April Gallop, ¶45; Affirmation of Mustapha Ndanusa, ¶11.
[10] Kean and Hamilton, "Without Precedent: The Inside Story of the 9/11 Commission

the conspiracy.[11]  The Court's embrace of its findings proves how effective it has been in this regard—and also that the conspiracy is ongoing.

There is no way in law that either Court was empowered to weigh evidence and find facts in this fashion, at the pleading stage, when the plaintiff was absolutely entitled to have her version taken as true.

**         **         **         ** 

Over the past ten years there has been an extraordinary accumulation of striking and verifiable revelations, presented by highly qualified experts in appropriate fields after diligent and painstaking research, tending to refute virtually all of the main points of the official position concerning what happened on 9/11.[12] Those anomalies which have slipped or muddled into some public notice are quickly bundled back under the mainstream taboo.  But these issues are clearly the legitimate stuff of a lawsuit; and the facts they're based on—however horrifying or grim their implications—are far from "conclusory", or "baseless" or "fanciful…"; indeed, most of them are conclusively established.  They are part of a complicated narrative of ghastly treachery presented in the Complaint, and reprised in the Brief on Appeal.  It may be scandalous, and repulsive, and may invite partisan attack, but it is grounded in a deep, rich soil of plain facts—historical as well as physical

---

[11]  Professor Griffin has identified 115 separate and distinct Wrong Things about 9/11 promulgated by the Commission.  See Griffin, "The 9/11 Commission Report: Omissions and Distortions", Olive Branch Press, 2005.

[12]  See "Verifiable Media Timeline of 9/11, http://www.wanttoknow.info/9-11cover-up10pg , attached as Exhibit C to the Affirmation of Mustapha Ndanusa.

and scientific—which plaintiff was entitled to have taken as true, because they're <u>not</u> conclusory, or lacking in plausibility, because they arise from what actually happened.

The judgment of frivolousness, or "implausibility", cannot fairly or even rationally be applied to claims that rest on such an extensive body of facts as are assembled in the Complaint, and to be assembled, to make out the plaintiffs' case.

## CONCLUSION

The Search for Truth about the 9-11 attack has been powerfully hindered, misdirected and stonewalled by the defendants and the rest of the Government from the very beginning, and was also by the official 9/11 Commission that was finally appointed. As reflected in Respondents' attached materials, and the entire record, the material basis for doubt of official accounts, and negation of the finding(s) that our complaint is frivolous, is solid and enormous. It is simply a wholly unreasonable judgment, given the failure to comply with the assessment required by *Iqbal*, and the breadth and cogency of the facts alleged.

It is even more unreasonable and unfounded—and intimidating and chilling of the fundamental right to confront power, and powerful figures—for the Court to punish the plaintiff and her lawyers for making the allegations here, given the strength of the factual basis for them, and for appealing their dismissal, when we

obviously had the right to do it, regardless of the felt offensiveness of what we said.  As the Court for the Seventh Circuit said, in the world's most famous conspiracy case,

> Attorneys have a right to be persistent, vociferous, contentious, and imposing, *even to the point of appearing obnoxious*, when acting in their client's behalf. An attorney may with impunity take full advantage of the range of conduct that our adversary system allows. Given this *extreme liberality necessary to a vital bar* and thus the effective discovery of truth through the adversary process, an attorney possesses the requisite intent (to commit contempt, or, say, deliberate, malign frivolity—ed.) ***only*** if he knows or reasonably should be aware in view of all the circumstances, especially the heat of controversy, that he is exceeding the outermost limits of his proper role and hindering rather than facilitating the search for truth.

*In re Dellinger, et al*, *and Kunstler and Weinglass* , 461 F.2d 389, 400 (7th Cir. 1972)(Emphasis added).

The conspiracy theory here is not frivolous, as we have shown, but even if it were, or if judges were given the freedom to exercise their unfettered personal feelings about it regardless of the facts, it cannot be lawful to punish us for bringing it up, in good faith allegations and plausible theories presented to the Court, just because such claims affront or enrage those in high office.  We needn't rehearse all the Constitutional cases and pronouncements of the founding fathers, or Holmes and Brandeis, Black and Douglas, et al, to say so. Because, the Panel said it themselves.

**WHEREFORE**:  the plaintiff-Appellant and her undersigned counsel, and each of them, pray that the Rule to Show Cause entered herein on April 27, 2011, be vacated and dismissed; and that the Court grant such other and further relief as is just and appropriate in the premises.[13]

Respectfully submitted,

DATED: July 11, 2011
/S/ [Mustapha Ndanusa]

On the Petition:

Dennis Cunningham, Esq                William Veale, Esq
115-A Bartlett Street                 2033 North Main Street, #1060
San Francisco, CA 94110               Walnut Creek, CA 94596
(415)-285-8091                        (925)-935-3987

Mustapha Ndanusa, Esq
26 Court Street, Ste 603
 Brooklyn, NY 11242
 (718) 825-7719
Attorneys for Plaintiff-Appellants

---

[13]    Please take note of the Motion of Dennis Cunningham, lead counsel for plaintiff and principal author of the plaintiffs' pleadings here and in the district court, for admission to the bar of this Court *pro hac vice*.  It is found at the end of his within Affirmation.

**CERTIFICATE OF COMPLIANCE WITH SECOND CIRCUIT RULE OF APPELLATE PROCEDURE 32(A)(1)(F)**

CASE NAME:              GALLOP et. al v. CHENEY

DOCKET NUMBER:     10-1241

1. The PDF version of this Appellants' Memorandum In Response To The Court's April 27, 2011 Order Imposing Sanctions, along with the accompanying affidavits and Exhibits, has been scanned for viruses using Norton 360 AntiVirus and no virus has been detected.

Dated: July11, 2011 Brooklyn, New York

/s/ [Signature]

Mustapha Ndanusa, Esq. Attorneys for Plaintiff-Appellants APRIL GALLOP and E.G., a minor